UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,                    Case No. 15-cr-95 (WFK)

        - v. -

AKHROR SAIDAKHMETOV,

                Defendant.

--------------------------------------------------------x

**Defendant Akhror Saidakhmetov's**
**<u>Memorandum In Aid of Sentencing</u>**

Perlmutter & McGuinness, P.C.
260 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (212) 679-1990
Fax: (888) 679-0585
Attorneys for Akhror Saidakhmetov

# **Table of Contents**

Preliminary Statement ........................................................................................... 1

Akhror's Personal History ..................................................................................... 3

   A.  Akhror's Early Childhood ........................................................................ 3

   B.  Akhror's Life in Uzbekistan ................................................................... 7

   C.  Akhror's Early Life in the United States ............................................. 11

   D.  Akhror's Religious Awakening ............................................................ 12

Akhror's Offense Conduct ................................................................................... 13

   A.  Background of ISIL................................................................................. 13

   B.  Effects of ISIL on Akhror ...................................................................... 15

   C.  The FBI Monitors Akhror & Juraboev.................................................. 16

   D.  The FBI Confidential Informant ........................................................... 19

   E.   Akhror Plans to Travel ........................................................................ 20

The Court Should Sentence Akhror to a Term of 72 Months
and Lifetime Supervised Release ........................................................................ 23

   A.  Legal Framework for Sentencing ...................................................... 23

   B.  The Nature and Circumstances of the Offense and the History and
       Characteristics of Akhror Saidakhmetov ......................................... 24

   C.  A 72-Month Sentence Adequately Reflects the Seriousness of the Offense,
       Promotes Respect for the Law,
       and Provides Just Punishment for the Offense ................................ 26

          1. Sentencing Entrapment ................................................................ 27

          2. Imperfect Entrapment .................................................................. 28

D.  A 72-Month Sentence Affords Adequate
Deterrence to Criminal Conduct .................................................. 29

E.  72-month Sentence is Sufficient to Protect the Public from
Further Crimes of the Defendant. ............................................... 30

F.  The Need for the Sentence to Provide the Defendant with Needed
Educational or Vocational Training, Medical Care, or Other Correctional
Treatment in the Most Effective Manne ........................................ 31

G.  A 72-Month Sentence Avoids Unwarranted Sentence Disparities Among
Defendants with Similar Records Who Have Been Found Guilty of Similar
Conduct ............................................................................... 33

Housing Request ............................................................................... 37

Conclusion ....................................................................................... 37

## Preliminary Statement

Life has been hard and confusing for Akhror Saidahkmetov.  In the short 19 years prior to being arrested, he was raised without a father, and lived a life adrift between an oft absent mother, her family, and ultimately a small circle of "friends", who turned out to be anything but.  The lucky among us have fathers, who help guide our way, but Akhror, like many young men that come before this Court, had less than nothing.  Akhror had an abusive, alcoholic Muslim, from an arranged traditional marriage, who effectively abandoned Akhror as a baby.

Unfortunately, Akhror's mother did little to make up for the loss.  During Akhror's childhood, his mother repeatedly left him for long periods of time.  Following her disastrous marriage to Akhror's father, she moved from Kazakhstan to Uzbekistan to find better work.  She had little time for Akhror while searching for work in a community that harshly stigmatized her divorce.  She searched further, leaving Akhror alone for three extended periods.  She traveled to Germany, then to Malaysia to work in journalism, and finally to the United States where she resettled, seeking to avoid persecution.  Her family, mainly her sister's family, cared for Akhror in her absence, but they were ultimately a poor substitute for his mother.

By the time Akhror reunited with his mother in Brooklyn at the age of 16, he was an ethnic Uzbek adolescent with very limited English skills.  He struggled to acclimate to a new life in New York City.  Even then his mother left him largely alone, as she worked long hours as a cleaning woman.  Akhror was adrift,

immature, young and lost in modern America.  His timing could not have been worse.  To fill the void, as many young people may do under his circumstances, Akhror turned to religion, in his case, Islam.  Tragically, his religious immersion coincided exactly with the sudden rise of the Islamic State in Iraq and the Levant ("ISIL") in 2013 and 2014.

Searching for his place in the world, Akhror fell in with his co-defendant, Abdulrasul Juraboev, and a savvy FBI confidential informant.  At the same time, the media-savvy exhortations of ISIL, targeted young, adrift people just like Akhror.  It was the perfect trap, especially for someone so impressionable, with no effective parenting during his formative years.

Akhror now stands before the Court guilty of participating in a conspiracy in Brooklyn to travel to Syria and join ISIL.  Thwarted by his arrest, we will never know whether Akhror would have made it there, although some evidence discussed *infra* suggests otherwise.  Whatever the case, Akhror now stands before the Court 22-years-old, deeply remorseful for his actions, and with much of his life still before him.  That future may result in removal back to Kazakhstan, depending on whether he can be protected from persecution.  No matter what happens, he must first face the justice of this Court.  Under the unique circumstances of this case, a term of 72 months and lifetime supervised release would be sufficient but not greater than necessary to meet the ends of justice.

## Akhror's Personal History

### A.   Akhror's Early Childhood

Akhror was born on June 26, 1995, in Turkestan, Kazakhstan, to Saiera Gulyamova and Abror Yuylanov.  PSR ¶ 46.  Turkestan is a small, backwater city along the ancient Silk Road.  Marital strife between Akhror's parents defined his infancy.  PSR ¶ 46.  Akhror's father, Abror, who still lives in Turkestan, was and remains a chronic alcoholic.  *See* Report of Defense Investigator Eric Mercer, L.C.S.W., at 3 (hereafter "Rep.").[1]



Akhror's parents prior his birth.

Abror married Akhror's mother through a traditional arranged marriage.  Rep. at 3.  Abror regularly violated the Islamic prohibition against alcohol, but exhorted his wife to adhere to traditional Muslim customs.  Abror abused his wife

---

[1] The factual reporting contained in Erik Mercer's report, as well as this memorandum, are based on interviews conducted with Akhror's extended family and others in Kazakhstan and elsewhere.  Kazakhstan diplomatic representatives have been helpful assisting the defense throughout Akhror's case.  We have refrained from having specific family members identified through personal writings to protect their privacy.

through verbal degradation, frequent physical attacks, choking and rape.  *Id.*
Akrhor's mother remained trapped in this horrific marriage, dissuaded from leaving
by her conservative family who scorned any suggestion of divorce.  *Id.*  On several
occasions, she fled to her family after Abror abused her, only to be turned away and
chastised that divorce would shame the family.  *Id.*

Akhror's mother finally escaped when Akhror was four years old.  *Id.*  Abror
abandoned all responsibility for his son.  Since then, Akhror has only seen his
father on a few brief occasions, wandering drunk around Turkestan. And, on one
other occasion in Tashkent, Uzbekistan, Abror appeared for a few hours, well-
dressed and driving a Mercedes.  Akhror ran away to not meet him that time.
Today, Abror is an alcoholic, itinerant construction worker in Turkestan.  PSR ¶ 46.

The divorce made Akhror and his mother pariahs in the conservative
community.  Strong, traditional family networks are at the center of ethnic Uzbek
culture.  Akhror's mother came from a large family that tried to fill the void.
Akhror first spent a few years in the village of Chernyak, a small former Soviet
collective farm in the arid lands about 25 miles northwest of Turkestan.  Rep. at 1.
Chernyak is a rural agricultural community sitting on the edge of the great Kazakh
steppe – open grasslands running thousands of miles northwards toward Siberia.

Akhror loved his time in Chernyak.  Rep. at 2.  He lived with his mother in
her mother's house surrounded by extended family: aunts, uncles and young cousins
around his age.  Life in Chernyak was simple.  The men worked as farmers tending
fields surrounding the collective, and the women as teachers in a village school.  *Id.*

at 2-3.  Running water in the house was for cooking.  Behind the house was a small structure with an oven where Akhror's grandmother, mother and aunts baked bread and prepared meals for the family.  Family members relieved themselves in an outhouse in the enclosed family compound, which was no more a hut with an open hole and no seat.  There were two houses used by the family.  Akhror and his cousins drifted in and out of each house to sleep, eat, and play.  They were poor, but between farm work, and the women, including Akhror's mother and aunt, supplementing the family income from teaching, there was always food on the table.



Akhror (spelled in Kazakh as "Axror") in a school picture from his time in Chernyak.

Akhror only spent his infancy in Chernyak, and started school there, but returned for summers.  *Id.* at 2.  Akhror loved spending time with the farm animals and his cousins.  *Id.* at 2-3.  He is remembered for being particularly sensitive to animals, and, in particular, one work horse who pulled a plow, reflecting his capacity for empathy.  *Id.* at 10-11.



Akhror with one of his
young cousins in Chernyak.

Islam played a very limited role in Akhror's early family life, especially after his father left.  Chernyak had a small mosque that had been built since the fall of the Soviet Union in the early 1990s.  Prior to that time, the Soviets had worked actively to suppress any Islamic practice in Kazakhstan and through Soviet Central Asia.  The Soviet ethos held that all religion, including Islam, existed only as an "opiate of the masses" whose obliteration was a prerequisite to the realization of a perfect communist state.[2]

Since the dissolution of the Soviet Union in 1990, mosques have proliferated throughout Southern Kazakhstan, including a small one in Chernyak.  But Akhror's

_____

[2] Even though Akhror was born after the dissolution of the U.S.S.R., the Soviet experience defined a great deal of his world.  For instance, Akhror's being ethnic Ubzek living in Southern Kazakhstan resulted from Stalin drawing national lines to divide and weaken Central Asian ethnic populations.  Akhror's family living for several generations on a former collective farm is the result of Stalin resettling nomadic and ethnic peoples from Central Asia as part of the disastrous collectivization process in the 1930s.  Even Akhror's last name reflects when the Soviets changed the names of Central Asian citizens.  Saidakhmetov is derived from the common Muslim name "*Said Achmed",* with the Russian suffix for male last names "ov".  Hence, "*Said Achmed-ov*" or "Said-akhmet-ov".

family, while traditionally Uzbek, appear to have little connection to Islamic practice. They self-identify as Muslims, but they work on Fridays, do not attend communal Friday *Juma* prayers, and their observance of Ramadan is reportedly scant. Pork remains taboo, but the prohibition against alcohol is not absolute with many Muslims in Central Asia, although Akhror's father's alcoholism is considered deeply shameful.

## B.    Akhror's Life in Uzbekistan

When Akhror was approximately four-years-old, he and his mother moved to Tashkent, Uzbekistan. Rep. at 3; PSR ¶ 48. She moved there for greater economic opportunity beyond the options available to women in rural Kazakhstan, as well as to escape shame that she felt as a result of his disastrous marriage to Abror. She initially left Akhror in the care of his grandmother and extended family in Chernyak. Now, Akhror was left without a father or mother. Akhror's mother's extended family tried to fill the void. Eventually, his mother sent for Akhror to live with her in areas in and around Tashkent, the capital of Uzbekistan and the largest city in Central Asia. Rep. at 3-4; PSR ¶ 48.

Despite being united with his mother, this period of Akhror's life was marked by terrible loneliness. When they resided in Tashkent proper, Akhror lived with his mother on the top floor of a dilapidated apartment building that was part of a former Soviet housing complex. Rep. at 3. At the edge of the complex, local men repaired automobiles from shops in shipping containers. Homeless men and vagrants encamped in the area among overgrown weeds, broken sidewalks and

poorly maintained streets.  Akhror's mother worked long hours as a journalist, leaving Akhror to walk alone past this area on his way to and from the local elementary school every day.  *Id* at 3-4.  Akhror initially experienced difficulty with admission because of his Kazakhstan citizenship, even though he was ethnically Uzbek.

Starting at this time, Akhror's mother left him alone for long periods beginning when he was only  five years old.  Left to fend for himself in their small apartment, Akhror learned to light a stove at the age of seven.  He often cooked his own dinners and spent hours waiting for his mother to return home long after dark.  As Akhror describes it, "I was alone all the time.  I walked to school alone and came home alone.  My mother didn't get home until 9:00, so she left me dinner to eat by myself.  I was really scared being alone and used to talk to myself to try to feel safe."  *Id.* at 4



Akhror's Soviet housing tenement in Tashkent
where he would wait for his mother after dark.

On two occasions, Akhror lived with his aunt (his mother's sister), her husband and his two cousins in an area outside of Tashkent for extended periods when Akhror's mother left Uzbekistan to work in journalism in Germany and Malaysia.  PSR ¶¶ 46-48; Rep. at 5.  Akhror's aunt and uncle tried to provide structure for him, but they could never match the level of love and support that they gave their own children, Akhror's cousins.  Rep. at 5.

At times, the absence of Akhror's mother made things particularly difficult. On one occasion, Akhror fell from a tree he was climbing, broke his arm and suffered a serious compound fracture.  Akhror underwent surgery in Tashkent to repair an exposed bone poking through his skin.  While recovering in a hospital, Akhror spoke to his mother long-distance from Germany.  Akhror never mentioned the fall or surgery because he did not want to worry her.

Despite these incidents, Akhror seemed to find his footing as a young adolescent in Tashkent.  Rep. at 5-6.  He worked hard at school, albeit with only limited success, but found great satisfaction as a competitive swimmer, eventually training at the main Uzbekistan national swimming center in Tashkent.  *Id.* at 5-6. Towards the end of his time in Uzbekistan, Akhror sought admission to the Westminster School, a prestigious British-model high school.  *Id.* at 6.  Akhror's aunt and relatives recall that he studied hard to pass the entrance exams and did so successfully.  *Id.*  Akhror had expressed an interest in attending Westminster to place him on a path to working as a translator for foreign service representatives in Uzbekistan.  *Id.*

Despite this progress, his mother's absence defined his final year in Uzbekistan.  Rep. at 6.  By then, she had emigrated to the United States and obtained a green card claiming political asylum as a result, in part, of her work in journalism running afoul of the repressive Uzbekistan.  *Id.*  Although Akhror had been admitted to Westminster, and was having success as a swimmer, his mother insisted that he follow her to the United States.  *Id.*  Ahkor's aunt recalls the turmoil Akhror felt:

> Akhror was totally torn between his love for his mother and his desire for Westminster.  When he received the acceptance letter it was the same time his mother wanted him to go to the U.S.  He didn't know what to do.  He talked about it a lot.  He was emotionally torn.

*Id.*



Akhror and relatives visiting a mosque in Tashkent, Uzbekistan, just prior to his departure for the United States.

Despite having only a rudimentary knowledge of English, and giving up the life that he had worked so hard to make for himself as a teenager in Uzbekistan, Akhror bid his extended family goodbye and left for the United States to be with his

mother.  PSR ¶ 48; Rep. at 5-6.  His extended family recalls that while Islam had played a very small role in their life, especially in Uzbekistan where its practice was closely controlled by the government, they made a point of taking him to a mosque in Tashkent to pray for his safe passage to America.  On his way out of the mosque, Akhror acquired a book in Uzbek about practicing Islam.  Little did Akhror know it at the time, but the book would become his solace in the loneliness that he would confront in America.  It would also serve as the gateway to his current circumstances.

## C.  Akhror's Early Life in the United States

When Akhror arrived in America in the Spring of 2012, he settled with his mother in her apartment in the Brighton Beach section of Brooklyn.  PSR ¶ 48.  That area of South Brooklyn has a relatively large Uzbek population because of the predominantly Russian-speaking community.  His mother worked to make ends meet as a cleaning woman.

Akhror enrolled in James Madison High School in Marine Park, Brooklyn, starting in March 2012.  Rep at 7; PSR ¶ 48.  He failed to acclimate to James Madison and was transferred in February 2014 to Abraham Lincoln High School in Brighton Beach.  PSR ¶ 56.  Akhror struggled with his new life.  His English was poor, and communicating with his teachers and peers proved difficult.  Rep. at 7.  Also, the mix of students gave him no opportunity to become rooted with contemporaries.  Akhror grew progressively more isolated as he drifted between school where he had no friends, and home where his mother remained absent

-11-

working long hours to make ends meet.  Rep. at 7-8.  Akhror barely attended his new school, which was ill-suited to educate him.  In the Spring of 2014, the school recommended that Akhror pursue a G.E.D., and he quickly dropped out.  *Id.* at 7.

## D.   Akhror's Religious Awakening

Like many kids today, Akhror filled the loneliness of his life by turning to the Internet.  Rep. at 8.  He video chatted with cousins Kazakhstan and Uzbekistan.  This brought him some comfort, but they were far away and starting to live their own lives.  Akhror's cousins cared deeply for him living far away in America, but there was little they could do to support Akhror emotionally beyond spending time communicating with him over the Internet.



Akhror speaking with his cousins
on Skype in happier times.

The book Akhror bought in Uzbekistan about Islam provided him with a great deal of solace.  It was the only book in his native language that he had readily available to him.  And, it opened a new world for Akhror, leading him to seek out other Islamic teaching in Uzbek on the Internet.  Providing a sense of meaning and purpose that he never got from his parents, Akhror found his way out of loneliness by connecting to a community with Islam.  Soon, Akhror began going to local

-12-

Brooklyn mosques for prayers – first for the traditional community-wide, Friday *Juma* prayers, and then more frequently.

One teacher Akhror liked on the Internet in particular was Sheik Abdullah Bukhari, a dissident Uzbek cleric who ran a network of madrassah's in Istanbul. Sheik Bukhari filled much of the void in Akhror's life. Akhror could understand his lectures because Sheik Bukhari gave them in Uzbek. Sheik Bukhari encouraged young men to find their meaning in their lives through prayer and adherence to Islamic custom, and invited them to come to Istanbul for study.

Around this same time, Akhror had fallen in with a friend, his co-defendant Juraboev, at one of the local mosques. Rep. at 8. Juraboev was older than Akhror and, to Akhror, Juraboev's understanding of Islam was far deeper than his own. Akhror quickly fell under Juraboev's spell. Juraboev recommended hours-upon-hours of lectures for Akhror to watch about Islamic practice and spoke with Akhror extensively. Akhror jokingly called Juraboev "Sheik" in tribute to Juraboev's supposed deep level of learning.

## Akhror's Offense Conduct

### A.   Background of ISIL

In 2013 and 2014, events unfolded in the Middle East that profoundly affected Muslims throughout the World and, especially, Akhror. The roots of the problem stretch back to the beginnings of Islam and the struggle for succession after Muhammad's death in 632 A.D. The two main strains of Islam born from that struggle, Sunni and Shia, remain in deadly conflict today throughout large parts of the Middle East.

-13-

This situation played out in particularly lethal fashion in Iraq after the U.S. backed the formation of a government led by Nouri Al Maliki, a member of Iraq's minority Shia population.  Government-backed extrajudicial killings, murderous attacks on Sunni refugee camps and other violence against Iraq's Sunni majority fed into Sunnis calling for open rebellion against the Maliki government. Supporters of what would be known as ISIL come from fighters previously associated with Al Qaeda in Iraq, as well as former Ba'ath party members dismissed from the Iraqi government by Paul Bremer, the former U.S. Provisional Coalition Administrator of Iraq.

Rather than taking up direct armed rebellion against the Maliki government in Bagdad, however, these actors turned their sights to the vast western desert between Bagdad and the chaotic breakdown of order resulting from the Syrian civil war, which had been raging since the Arab Spring in 2011.  PSR ¶ 4.  Starting in 2013, the uprising moved swiftly, capturing large swaths of Western Iraq and Eastern Syria, including the Syrian city of Raqqa.  In January 2014, the Iraqi city of Fallujah fell and with it much of the large western Anbar province.  That was followed in June with the fall of Mosul, Iraq's second largest city.

On July 5, 2014, Sunni cleric and ISIL leader Abu Bakr al-Baghdadi declared the formation of an Islamic caliphate.  *Id.*  Baghdadi had been the head Al Qaeda in Iraq since 2010, but had since broken with the larger Al Qaeda leadership and reformed under the banner of ISIL.  His declaration of the caliphate in the captured lands between Iraq and Syria harkened his followers back to the golden age of Islam

-14-

between the Seventh and the Fourteenth Centuries.  The pronouncement of the Caliphate travelled around the world, connecting with many young disaffected Muslim men, including Akhror.

**B.      Effects of ISIL on Akhror**

During the Spring and early Summer of 2014, young Sunni Muslims expressed support for the caliphate on Internet. Young Sunni Muslims were elated to see the U.S.-backed government experience humiliating defeats on the battlefield as large swaths of the country fell to the caliphate.  Akhror was caught up in the elation as well.  Although ISIL was murderously brutal with its enemies, it was mainly directed against Shia Muslims who supported the U.S.-backed Maliki government.  ISIL's propaganda espoused that their ancient feud with the Shias justified these vicious actions.

The rise of ISIL fed into Akhror's new found sense of belonging that accompanied his immersion into Islam.  Instead of being a lonely kid lost in Brooklyn with limited English proficiency, he was part of a worldwide online community – the *Ummah* – supporting an Islamic religious movement that was on every news channel and the front page every paper in the World.  Sadly, to sustain the feeling of belonging, Akhror was willing to say anything, even celebrate violence against Shia civilians and shrines by ISIL.  *Id.*  Akhror expressed support for ISIL fighters on social media. When his cousins in Kazakhstan expressed their concern to Akhror about the content of his social media posts, he assured them that he was alright and to not worry.

-15-

Akhror was willing to tell anyone anything at any time, so long as he could keep his semblance of a social network intact.  With Juraboev, and on the Internet, Akhror was a loyal supporter of the Cause.  With his mother, he was an immature, loving, though far too religious son, especially when he threw out all her beauty products because they may have contained traces of pork renderings.  With his cousins, he was the same old Akhror whom they knew as a child.  Unfortunately for Akhror, he would soon meet someone who would wantonly exploit Akhror's weakness to tell anyone what he thought they wanted to hear in order to feel the sense of belonging that had been absent in his life since childhood.  That would take the form of expressing radical thoughts to an FBI informant who was adept at getting Akhror to literally say anything.

### C.  The FBI Monitors Akhror & Juraboev

In early August 2014, within a month of Baghdadi declaring a caliphate, the FBI monitored social media traffic apparently tied to Juraboev.  PSR ¶ 7.  These posts expressed support for ISIL.  *Id.*  As a result of these communications, on August 15, 2014, the FBI interviewed Juraboev in Brooklyn.  *Id.*  He purportedly confirmed the content of what he had posted, including that he would engage in terroristic activities in the United States, but only if that conduct received prior religious approval.  PSR ¶ 7; *see also* Complaint and Affidavit of FBI Special Agent Ryan Singer in Support of Arrest Warrant, sworn to February 24, 2015, at ¶ 6 (hereafter "Compl.").  Juraboev thereafter clarified during a second FBI interview, on August 18, 2014, that he would only undertake activities if an order from ISIL

-16-

"had a basis in the Koran and the 'Sunna' [the traditions of the Prophet Muhammad]." Compl. ¶¶ 10, 11; PSR ¶ 7. Juraboev stated, "If I get a command from the Islamic Caliphate that is according to Quran and Sunnah if I gave pledge to ISIL and I have the means to carry out the given command and if I can make my intention only for Allah." *Id.*

During his August 18, 2014 interview, Juraboev also said that his young friend, Akhror, shared similar views. Compl. ¶12; PSR ¶ 7. The FBI then began reviewing Akhror's social media and confirmed that he had expressed support for ISIL approximately 10 days earlier on August 4, 2014. Compl. ¶ 13; PSR ¶ 8. Based on this information, the FBI commenced electronic monitoring. By mid-September, the FBI monitoring established that Akhror and Juraboev were gathering information about how to travel to Syria. PSR ¶ 8. Specifically, when Juraboev expressed concern that the people he contacted would only help travelers they knew, Akhror said that he had a contact who said travel was possible if one could get to "Tuela" in Turkey. Compl. ¶17 ("a brother I talked to told me that if I get to Tuela, he would send the brothers to pick me up . . . it's better to discuss with a brother on my site, because he told me he would meet."); PSR ¶ 11. Akhror did not know where Tuela was located. *Id.* Research has discovered no place in Turkey with that name.

Sometime in or around early September, the FBI learned that Akhror was having great disruption in his life. Akhror's deepening religiosity severely strained his relationship with his mother. He disapproved of the life she was living in the

United States.  She was not religious.  Her beauty products possibly contained pork renderings.  She did not cover her head.  She did not go to mosque on Fridays.

Akhror's mother expressed great frustration with what was happening and decided that Akhror should start living independently from her.  She believed, or at least rationalized, that it would help Akhror mature as an adult.  Instead, it repeated the pattern of abandonment at the worst time possible.  Akhror's mother found a new apartment for herself and he scrambled for roommates to help defray the rent.  Rep. at 8.  This plan had two serious effects.  First, even prior to living apart, the notion his mother wanted to be separated from him yet again was so unsettling that Akhror ran away and began sleeping on the beach of a local park. *Id.* at 10.  Second, as far as his mother was concerned, the only potential roommate to remedy the situation was Juraboev.  *Id.* at ¶ 8.

It was against this background that, on or about September 14, 2014, the FBI inserted the confidential informant into the mosque where Akhror and Juraboev prayed.  *Id.* at ¶ 14.  The timing could not be more precipitous. As part of the process of moving in together, Akhror and Juraboev had discussed getting a third roommate to help defray the costs.  Now, out of nowhere, someone had shown up at their mosque, who shared their deep religious beliefs and interest in ISIL, and who, coincidently, was looking for a place to live.

D.    The FBI Confidential Informant

What followed was the classic manipulations of a professional confidential informant.  The informant and Juroboev presented Akhror, at long last with a small, tight circle of friends with whom he could connect.  The fact that they were slightly older was even more inviting for Akhror.  His mother eagerly approved of the arrangement because she thought their influence would help with Akhror's maturity, providing him with the male guidance that he so desperately lacked.  Akhror was eager to feel accepted.  And, the confidential informant was more than willing to oblige that desire.

With this dynamic in play, the confidential informant could literally get Akhror to say anything, whether Akhror truly believed it or not.  Statements that suggested any daylight in Akhror's thinking away from radicalism were met with consternation and ridicule by the confidential informant.  With Svengali-like deftness, the confidential informant coaxed Akhror towards professing ever more outrageous radical sentiments. Ever wanting to please, Akhror joined in his own version of Trump-like "locker room talk."

But Akhror's words to the confidential informant cannot be taken at face value. For example, during one exchange, the confidential informant easily encourages Akhror to describe going on an adolescent, video-gamer rampage starting with acquiring a machine gun, to an all-out, one-man-war, stretching from the NYPD to the FBI at its headquarters in Washington, D.C.  In fact, the

description was based on Akhror's favorite first-person-shooter videogame,

Counterstrike.  As Akhror states,

> I will just go and buy a machine gun, AK-47, go out and shoot all police
> . . .  It is legal in America to carry a gun.  We will go and purchase one
> handgun . . . then go and shoot one police officer.  Boom . . .. Then, we
> will take his gun, bullets and a bulletproof vest . . . then, we will do the
> same with a couple of others.  Then we will go to the FBI
> headquarters, kill the FBI people. . ..

Compl. ¶¶ 17, 34.  Elsewhere, Akhror fantasizes about hijacking a plane on his way

to Syria, then delivering the plane to ISIL, and enjoying teen, sexual exploits with

slaves awarded to him by ISIL.  *See* Ex. A at 4-5; Ex. B at 37, Gov't Bates Stamp

No. 123-124.

These statements are absurd, violent, sex-driven adolescent fantasies and

nothing more.  Akhror never purchased a gun, or even used one, beyond videogames

that he would play when he was not endlessly surfing the internet to learn about

Islam.  Akhror made these statements only to garner the acceptance of his supposed

friends in his otherwise lonely world.  Notwithstanding, as a result of the

confidential informant's promptings, these statements became the basis, in part, for

Count 3 of the Third Superseding Indictment against Akhror, Conspiracy to Possess

a Firearm in violation of 18 U.S.C. §924(c).

### E.   Akhror Plans to Travel

Starting even before the confidential informant arrived on the scene,

however, Akhror and Juraboev discussed traveling to Syria to live within the

Islamic State.  PSR ¶ 13.  After the confidential informant arrived, that planning

went into overdrive.  *See generally*, *id.* at ¶¶ 13-16.  The confidential informant

actively encouraged Akhror to go in order to live as a true Muslim.  To further that effort, the confidential informant worked with Akhror to put the plans in place to travel, including Akhror obtaining a plane ticket and U.S. State Department travel papers available to Akhror as a legal permanent resident.  *Id.* at ¶¶ 17-18.

In executing his plans, Akhror held himself at all time as desiring to travel to Syria and conducted himself accordingly, both to enhance his reputation among Juraboev and the confidential informant, and to actively spur on their illicit travel plans as well.  Akhror's conduct around his travel papers, however, show the level of manipulation by the confidential informant.  Before the confidential informant's arrival, Akhror's mother held his passport, and would not release it to him because of her concerns that his religiosity would lead him to travel to Syria.  PSR at ¶ 17.  In response, and at the confidential informant's suggestion, Akhror worked with the confidential informant to obtain new travel documents in January 2015.  *Id.* at ¶¶ 17-18.  Akhror had no idea that these type of travel documents were even available to him but for the confidential informant making Akhror aware of this option.  Akhror's activities with the confidential informant to obtain a set of these documents formed the basis of Count 4 of the Third Superseding Indictment (Travel Document Fraud).

Akhror also purchased an airline ticket to Istanbul, and discussed his and Juraboev's travel arrangements.  PSR at ¶ 20.  They had logistical discussions about their travel, including how much money they would need to take, the type of clothing and equipment they would need, and what weapons would be available to

-21-

them upon their arrival.  *Id.* at ¶ 14.  Akhror's actions and support even prompted Juraboev to advance his airline ticket by approximately one month to leave during the first week of March in closer proximity to when Akhror and the confidential informant planned to travel.  Akhror also discussed how he and Juraboev would rendezvous with ISIL representatives after crossing into Syria.  *Id.* at ¶ 8.  Akhror further instructed Juraboev to delete Akhror's social media account so as to not draw scrutiny of their plans, as Juraboev's posts had done in August 2014 when the FBI initially came to visit.  *Id.* at ¶ 12.

With these plans in place, Akhror worked to gather funds to pay for his travel and made arrangements to depart the United State for Istanbul on February 25, 2015.  PSR at ¶¶ 21-22.  Akhror raised the money by collecting wages owed to him from fixing cracked cell phone screens at mall kiosks in Georgia, Virginia and Pennsylvania through the fall and early winter.  Akhror's loneliness from being out of town by himself for extended times provided the confidential informant with ample opportunity for long telephone calls with Akhror.  All of the pieces were fit perfectly in place for the confidential informant to move Akhror from believer, to planner, to doer, and, eventually, to Akhror's arrest on a jet way at JFK boarding a plane to Istanbul.  *Id.* at 22.

## The Court Should Sentence Akhror to a Term of
## 72 Months and Lifetime Supervised Release

**A.    Legal Framework for Sentencing**

As the Court is aware, the Guidelines, "formerly mandatory, now serve as one

factor among several courts must consider in determining an appropriate sentence."

*Kimbrough v. United States,* 552 U.S. 85, 90 (2007); *see also Gall v. United States,*

552 U.S. 38, 59 (2007).  "The statute, as modified by *Booker,* contains an

overarching provision instructing district courts to 'impose a sentence sufficient, but

not greater than necessary,' to achieve the goals of sentencing."  *Kimbrough,* 552

U.S. at 101 (citing 18 U.S.C. § 3553[a]); *United States v. Booker,* 543 U.S. 220

(2005).  Because the "Guidelines are not the only consideration," the Court, "after

giving both parties an opportunity to argue for whatever sentence they deem

appropriate... should then consider all of the § 3553(a) factors to determine whether

they support the sentence requested by a party." *Gall, supra* at 49-50.

A judge must independently evaluate the appropriate sentence in light of the

§ 3553(a) purposes and factors, and must consider arguments that the guidelines

should not apply on general policy grounds, case-specific grounds (including

guideline-sanctioned departures), or "regardless."  *Rita v. United States,* 551 U.S.

338, 347-351 (2007).

At sentencing the judge "may not presume that the Guidelines range is

reasonable." *Gall,* 552 U.S. at 50.  *See also Rita, supra* at 351.  If the Court decides

that a sentence outside of the Guidelines is warranted, then the Court "must

consider the deviation and ensure that the justification is sufficiently compelling to

-23-

support the degree of variance." *Gall,* 552 U.S. at 50. "Extraordinary circumstances" are not required to justify a sentence outside of the Guidelines range. *Id.* at 47.

Of great importance is the fact that district court judges must now consider and respond to non-frivolous arguments that a Guidelines sentence itself reflects an unsound judgment because it fails to properly reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way, or a different sentence is appropriate regardless. *Rita,* 551 U.S. at 357. Appellate courts may not "grant greater fact finding leeway to [the Commission] than to [the] district judge." *Id.* at 347. Even the government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'" *Kimbrough,* 552 U.S. at 101

## B. The Nature and Circumstances of the Offense and the History and Characteristics of Akhror Saidakhmetov.

The nature and circumstances of the offense warrant a sentence of 72 months. Akhror's conduct never involved the perpetuation of violence against the United States or any of its interests. To the contrary, any ideation of Akhror personally engaging in terroristic acts, especially domestically, occurred *only* after the arrival and at the promptings of the confidential informant. Prior to that time, Akhror expressed support for the activities of ISIL, but those endorsements, distasteful as they were, were both protected speech and religious belief.

Akhror's statemets were also the product of Akhror's youthfulness and immaturity. As the Supreme Court has recognized, youthful offenders often suffer

-24-

from impulsivity, recklessness, susceptibility to peer pressure, and lack of control over their external surroundings — qualities that "do not disappear when the individual turns 18." *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) ("It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.'" (quoting *Roper*, 543 U.S. at 570)); *Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside").

Akhror's psychological development was substantially disrupted by the repeated abandonment of both of his parents and his complete isolation when he was thrust into a foreign country with no family or friends and no language skills to obtain them. According to the landmark psychologist Eric Erikson's Stages of Psychological Development, the years between infancy and adolescence are where a person's most fundamental senses of being are formed, such as the ability to trust, the ability to act autonomously, and the ability to develop a sense of identity and purpose. *See* Doreen A. Rosenthal, et al., *From Trust to Intimacy: A New Inventory for Examining Erikson's Stages of Psychological Development*, 10 Journal of Youth and Adolescence 525, 526 (1981). Rosenthal notes:

> Adolescence is regarded by Erikson as central to his theory because when the individual reaches this stage, the usefulness of identification as a mode of adjustment ends and identity formation proper begins. If

the adolescent does not succeed in forming a strong identity – rooted in family, race, or ideology – adulthood becomes very difficult.

*Id.*

Because of Akhror's upbringing, he was denied peers, much less role models, and was often completely physically or linguistically isolated from those around him.  It is that isolation, and the challenges that it posed to having him develop his own independent identity, that made him exceptionally vulnerable to exploitation. It is with this backdrop that the Court should consider the requested sentence.

Moreover, while Akhror's intent to travel to Syria was formed prior to the introduction of the confidential informant, execution of the plan was made possible only by the confidential informant's intervention.  But for those actions, Akhror's mother would have retained his passport, preventing Akhror from traveling.  It is certainly within the government's purview to police domestic support for ISIL. At the same time, the Court must take into account that the confidential informant provided Akhror with the means to execute the plan to travel to Syria by guiding him through the process of obtaining travel papers as a permanent resident. Frankly, but for the confidential informant, the conduct would have likely never happened.

## C.   A 72-Month Sentence Adequately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense

Akhror does not minimize his actions.  Instead, he requests that the Court, in its discretion, consider the circumstances surrounding the offense conduct, mainly, the active and aggressive encouragement of the government's confidential

informant, when deciding its sentence.  The requested sentence reflects a serious amount of incarceration for someone who has never previously served any time in prison.

The government would have done well to have considered a civil injunctive remedy for Akhror's suspicious behavior in the summer of 2014.  *See* 18 U.S.C. §2339B(c).  It chose, however, to ensnare Akhror by using its confidential informant to set in motion a chain of events that actively encouraged Akhror to travel to Syria and provided him with the means to do so.  Akhror's sentence should be reduced to reflect these circumstances.

### 1.  Sentencing Entrapment

The issue of whether sentencing entrapment is grounds for a reduced sentence is still an unsettled matter of law in the Second Circuit.  *See United States v. Caban*, 173 F.3d at 93 n.1. (2d Cir. 1999) ("The status of sentencing entrapment claims in the Second Circuit is 'unclear'").  When it is applied, however, it is in extremely limited circumstances.  *See United States v. Gomez*, 103 F.3d 249, 256 (2d Cir. 1997) ("…even where [sentencing entrapment] has been approved in theory, its potential application has been limited to outrageous official conduct which overcomes the defendant's will").

Generally, to apply the doctrine of sentencing entrapment, the defendant must prove that the "government agents induced [him] to commit an offense that [he] was not otherwise predisposed to commit." *United States v. Knecht*, 55 F.3d 54, 57 (2d Cir. 1995).  In the present case, Akhror was not necessarily predisposed to

-27-

committing the firearms and false documents offenses, namely, for Count 3 (Conspiracy to Possess a Firearm in violation of 18 U.S.C. §924(c)) and Count 4 (Travel Document Fraud). To the extent that Akhror may have been predisposed to traveling to join ISIL, the confidential informant encouraged Akhror to ideate domestic violence where he had previously not done so. And, he told Akhror how to get travel papers under false pretenses where Akhror never even knew that this documentation existed. The Court should apply sentencing entrapment to discount any consideration of this conduct in determining Akhror's sentence.

### 2. Imperfect Entrapment

Even if the Court finds that sentencing entrapment does not apply, it may find that imperfect entrapment does. *See United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2000) (finding that imperfect entrapment embodies government conduct that "does not give rise to an entrapment defense but that is nonetheless 'aggressive encouragement of wrongdoing'"). While the issue of whether imperfect entrapment is grounds for a downward variance is similarly unsettled in the Second Circuit, there is "nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment charge." *Id.* at 91

With the government's blessing, the confidential informant actively nurtured and escalated Akhror's radicalization, encouraged Akhror's plans to travel to Syria and join ISIL, and ultimately provided him with the means to do so. Beyond mere spiritual encouragement, the confidential informant's actions made Akhror's travel

physically possible.  Akhror's mother had taken Akhror's passport, hoping to prevent her son from travelling abroad.  Without his passport, Akhror believed that travel to Syria was not possible.  The confidential informant facilitated Akhror overcoming this perceived barrier by providing him an alternative means to acquire travel documents, allowing Akhror to turn his abstract, impossible plan into reality. For the same reasons as applies to sentencing entrapment, the Court also should consider the effects of Akhror's imperfect entrapment in fashioning a proper sentence.

### D.   A 72-Month Sentence Affords Adequate Deterrence to Criminal Conduct

For much the same reason, a 72-month sentence will afford adequate deterrence for criminal conduct by Akhror in the future, as well as by others. Akhror is deeply remorseful for his actions.  He states, "I feel terribly about what I have done.  I'm not that way anymore."  He wants nothing more than to peacefully serve the balance of his sentence, find the opportunity to work post-release, care for his mother and quietly practice his religion.  The experience of this investigation and prosecution has not left him bitter or angry.  Rather, he wants to move forward in a productive and law-abiding path.  In Akhror's words to counsel, "I just want to serve my time."

Given the circumstances, Akhror is unlikely to reoffend.  His future will most probably result in his removal to Kazakhstan where he will live out the rest of his life.  Assuming that he is released into Kazakh society, the police and security apparatus in that country will likely maintain very close scrutiny of Akhror.

Moreover, the experience of being arrested by U.S. federal authorities, as well as being incarcerated for several years by the Federal Bureau of Prisons, has impressed on Akhror that he does not want to ever reoffend or be re-incarcerated under any circumstances.

The requested sentence would also afford adequate general deterrence. The circumstances of Akhror's background, including his young age, have not made him immune to federal arrest and serious punishment. Even with the requested sentence, Akhror will be incarcerated for a large percentage of his life to date. The length of his punishment will serve as a warning to others that the road Akhror sought to travel will come with tremedously serious consequences. As a result, a 72-month sentence will promote general deterrence.

## E.   A 72-month Sentence is Sufficient to Protect the Public from Further Crimes of the Defendant.

The requested sentence is also sufficient to protect the public from further crimes by Akhror. In the first place, as noted above, the U.S. public will be permanently protected by further criminal conduct by Akhror because of his anticipated removal back to Kazakhstan. In the second place, the individual deterrent effect of the requested sentence will also protect the public in Kazakhstan in the future because the experience of U.S. incarceration will make Akhror unlikely to reoffend. Also, in the unlikely event that Akhror remains in the United States, the public will be protected from him through the requested term of lifetime supervision.

-30-

F.    **The Need for the Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Akhror's incarceration to date has given him the ability to begin the process of better understanding the peaceful aspects of his Islamic faith.  He has engaged in extensive study during his time at the MDC through a religious library acquired for him by counsel.  Those materials include instruction in Arabic language learning.  Akhror has used these materials to become a *quietist*, a Mulsim believer who directs religious struggle internally as opposed to externally through violent *jihad.*[3]  Akhror's plans to use the time of his continued incarceration during the period of the requested sentence to continue these studies.

Akhror should be encouraged to pursue this path because it offers the best hope that he will live a peaceful, law abiding life in the future.  In fact, during Akhror's post-arrest interview with the FBI, he indicated that he harbored potentially alternative plans upon his arrival in Istanbul.  Specifically, Akhror told the FBI that, rather than proceeding to Syria to join ISIL, he hoped to study at

---

[3] *See* "What ISIS Really Wants", Graeme Wood (The Atlantic, March 2015) (*https://www. theatlantic.com/magazine/archive/2015/03/what-isis-really-wants/384980/.*

Quietist[s] believe that Muslims should direct their energies toward perfecting their personal life, including prayer, ritual, and hygiene. Much in the same way ultra-Orthodox Jews debate whether it's kosher to tear off squares of toilet paper on the Sabbath (does that count as "rending cloth"?), they spend an inordinate amount of time ensuring that their trousers are not too long, that their beards are trimmed in some areas and shaggy in others.

Sheik Abdullah Bukhari's madrassahs.  As discussed *supra*, Akhror was a devoted follower of Sheik Bukhari because he could understand the Uzbek language Islamic lectures posted by Bukhari's institution on the internet.  He was also attracted to Bukhari's teachings that young men needed to discover their own paths in life through Islamic devotion.

Even though Sheik Bukhari was deceased, Akhror knew that he could find a place of refuge there if he made the journey to Istanbul.[4]  Counsel personally confirmed that Sheik Bukhari's madrasahs were open to accepting students like Akhror who showed up at the doorsteps of the facility in southern Istanbul.  After meeting in Istanbul with the current heads of the institution for several hours, counsel confirmed that the madrasahs still operated after Sheik Bukhari's murder, that they accepted students in this fashion, including providing them room and board, and that it did not encourage individuals to travel to Syria to join ISIL.

Akhror also self-identified during his FBI interview as *Hanafi*.  The *Hanafi* school is one the four religious *Sunni* schools of Islamic jurisprudence.  It predominates in Central Asia where Akhror was born.  Its sources for Islamic law are, in order of importance, *Quran*, recognized *hadith*, individual opinion from the *Shabah*, *Qyias* (analogy), *Istihsan* (juristic preferences) and finally local *Urf* (local custom).  *See* https://en.wikipedia.org/wiki/Hanafi.  Akhror embracing *Hanafi*

---

[4] Sheik Bukhari was shot to death in December 2014 outside his main madrassah in Istanbul by a Russian agent working on behalf of the Uzbekistan government.  *See https://www.dailysabah.com/turkey/2014/12/13/russian-suspect-nabbed-in-uzbek-preachers-murder; see also https://www.youtube.com/watch?v=DXQ-XwRLne0.*

tradition is significant because it agrees to embrace *Shria* law beyond only the strictest dictates of the Quran.

Akhror's sentence should encourage his attraction to Sheik Bukhari's more moderate aspects of Islamic belief and the *Hanafi* school of Islamic jurisprudence. Akhror's has much of his life before him.  His commitment to Islam remains fervent and genuine.  He has committed himself since his incarceration to a peaceful adherence to his religious faith.  His sentence should provide the education opportunity to continue along that path.

**G.     A 72-Month Sentence Avoids Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

The request sentence is also warranted given the periods of incarceration imposed on other similarly situated defendants.  According to a recent study by the National Security Law Center at Fordham University School of Law, the average sentence for ISIL-related crimes is 9.2 years.  That is five years less than the average sentences of al-Qaeda crimes between 2001 and 2014.  *See* Case by Case: ISIS Prosecution in the United States March 1, 2014 – June 30, 2016, Center on National Security at Fordham Law (last visited Oct. 3, 2017), *available at https://static1.squarespace.com/static/55dc76f7e4b013c8 72183fea/t/ 577c5b43197aea832bd486c0/1467767622315/ISIS+Report+-+Case+by+Case- +July2016.pdf.*

Of the 14 cases in the Fordham study, six of the sentences were either to probation or less than five years imprisonment.  Given that Akhror did not

undertake in earnest any steps to plot against U.S. targets, as well as his young age and childhood circumstances, the requested sentence falls well within the heartland of imprisonment imposed on similarly situated individuals.  As a result, the requested sentence will avoid unwarranted sentencing disparities among defendants who similarly lack any criminal records and who have been found guilty of similar conduct.

| Case | Charge | Sentence |
|---|---|---|
| *U.S. v. Conley*, D. Co., Case No. 14-cr-0163 | 18 U.S.C. § 2339(b) | 48 months; 3 years supervised release |
| *U.S. v. Coffman*, E.D. Va., Case No. 15-cr-0016 | 18 U.S.C. § 1001(a) | 54 months; 3 years supervised release |
| *U.S. v. Morgan*, M.D.N.C., Case No. 14-cr-0414 | 18 U.S.C. § 2339(a) | 180 months; 3 years supervised release |
| *U.S. v. Wolfe*, W.D. Tex., Case No. 14-cr-0213 | 18 U.S.C. § 2339(b) | 82 months; 5 years supervised release |
| *U.S. v. Davis*, S.D. Ga., Case No. 15-cr-0059 | 18 U.S.C. § 2339(a) | 180 months; lifetime supervised release |

| Case | Charge | Sentence |
|------|--------|----------|
| *U.S. v. Amin,*<br>E.D. Va.,<br>Case No. 15-cr-0164 | 18 U.S.C. § 2339(b) | 136 months; lifetime supervised release |
| *U.S. v. Diaz,*<br>S.D. Fl.,<br>Case No. 15-cr 20264 | 18 U.S.C. 922(g) | 120 months; 3 years supervised release |
| *U.S. v. Said,*<br>D. Mn.,<br>Case No. 15-cr-0145 | 18 U.S.C. § 111(a) | 4 years' probation |
| *U.S. v. Hodzic,*<br>E.D. Mo.,<br>Case No. 15-cr-0049 | 18 U.S.C. § 371 | 36 months; 3 years supervised release |
| *U.S. v. Abdulkadir,*<br>D. Mn.,<br>Case No. 16-cr-0002 | 18 U.S.C. § 111(a)(1) | 3 years' probation |
| *U.S. v. Elfgeeh,*<br>W.D.N.Y.,<br>Case No. 14-cr-6147 | 18 U.S.C. § 2339(a) (2 counts) | 180 months & 90 months; 27½ years supervised release |
| *U.S. v. Saadeh,*<br>D. N.J.,<br>Case No. 15-cr-0558 | 18 U.S.C. § 2339(b) | 180 months; lifetime supervised release |

| Case | Charge | Sentence |
|------|--------|----------|
| *U.S. v. Abood*, N.D. Tx., Case No. 15-cr-0256 | 18 U.S.C. § 1001 | 48 months; 3 years supervised release |
| *U.S. v. Teant*, E.D. Ca., Case No. 14-cr-0087 | 18 U.S.C. § 2339(a) | 144 months; 25 years supervised release |

*See* Case by Case: ISIS Prosecution in the United States, *supra.*

Many of the defendants in the cases above pleaded to much more egregious conduct than that alleged in the instant case. For example, Khaalid Adam Abdulkadir pled to 18 U.S.C. § 111, Assaulting, Resisting, or Impeding Certain Officers or Employees, and was sentenced to 3 years' probation, even though he conspired to travel to Syria to join ISIL, and then gathered outside the courthouse with friends to take photos of the federal agents and prosecutors. *See United States v. Abdulkadir*, No. 16-cr-0002, Compl. at ¶¶ 12-15, ECF No. 1 (D. Minn. Dec. 11, 2015). Similarly, Bilal Abood, who received a sentence of 48 months and 3 years of supervised release after pleading guilty to violating 18 U.S.C. § 1001, actually travelled to Syria, pledged an oath to Abu Bakr al-Baghadi, the leader of ISIL, and fought with ISIL. *See United States v. Abood*, No. 15-cr-0256, Ind. at 4-5, ECF No. 17 (N.D. Tex. June 10, 2015). While both Abdulkadir and Abood pleaded to different offenses than Akhror, the underlying conduct in their cases was much

-36-

more serious than that alleged here.  As a result, the Court should consider the relative conduct of these defendants in fashioning the proper sentence for Akhror.

## Housing Request

Akhror requests that the Court recommend that he be housed as near as possible to the New York City area to facilitation visitation by his mother.

## Conclusion

For the reasons stated here, Akhror asks that the Court impose the recommended sentence of 72 months, followed by a lifetime term of supervised release in the event that he is not removed from the United States.  Such a sentence will be sufficient but not greater than necessary to meet the ends of justice.

Dated:     New York, NY
           October 11, 2017

                              PERLMUTTER & McGUINNESS, P.C.


                              By: _____
                              Adam D. Perlmutter
                              260 Madison Avenue, Suite 1800
                              New York, NY 10016
                              Tel: (212) 679-1990
                              Attorneys for Akhror Saidakhmetov

# EXHIBIT A

# ERIK MERCER, L.C.S.W.

**381 SPRING STREET, PORTLAND ME  04102**
**49 WEST 24TH STREET, SUITE 1006, NEW YORK, NY  10010**

October 4, 2017

Adam Perlmutter, Esq. & Daniel McGuinness, Esq.
Perlmutter & McGuinness, P.C.
260 Madison Avenue, Suite 1800
New York, NY  10016

**Re: *United States v. Akhror Saidakhmetov:  Case No. 15-cr-95 (WFK)***

Dear Mr. Perlmutter and Mr. McGuinness:

This report is respectfully submitted on behalf of Akhror Saidakhmetov in advance of his sentencing before the Court. This submission provides detailed information about Mr. Saidakhmetov's developmental and psychosocial history.  In preparation for this report, multiple interviews were conducted with Akhror Saidakhmetov at the Metropolitan Correctional and Center and the Metropolitan Detention Center. Interviews were also conducted with Akhror's mother, Saiera Gulyamova, in Brooklyn, and multiple family and community members in Kazakhstan.

## INTRODUCTION

Akhror Saidakhmetov is a twenty-two year-old ethnic Uzbek, Kazakh national male who immigrated to the United States on March 12, 2012. Born into a secular Muslim family, Akhror spent his early childhood in the small village of Cernyak, Kazakhstan. When Akhror was four years old, he moved to Tashkent, Uzbekistan with his mother, after she fled a violent relationship with Akhror's father.  Akhror's early life with his mother was full of hardship and trauma. In addition to living in abject poverty, they both endured persecution due to their ethnicity and Akhror's mother was detained, interrogated and abused on multiple occasions by Uzbek authorities. In an attempt to create economic security for the two of them, Akhror's mother eventually left him in the custody of her sister so she could immigrate to the United States when Akhror was fourteen years old, leaving him without a parent. This was after his mother had also left him previously for extended periods of time.  This time, however, Akhror was placed in limbo because of his mother's protracted promises to bring him to

America, and the constant pressure she placed on him to forgo his educational and vocational goals in Uzbekistan so he would be ready to join her when the time came.

Akhror was sixteen years old when he finally came to the United States. His attempts to acculturate into his school and community were met with mounting obstacles when he arrived in Brooklyn. As young teenager, Akhror unsuccessfully attempted to integrate into an American school and develop a peer network. Akhror was even told by the public school system that he was too old (at the age of sixteen) to enter a high school without a command of English and a familiarity with American high school material.  Unmoored and depressed, Akhror turned to Islam and found comfort in its practice and teachings.  Yearning for guidance, friendship and adult support, he was drawn into a community whose teachings centered on a commitment to protect the community of Muslims worldwide (the *Ummah*). This ideology dovetailed with Akhror's own life experience of having his success unjustly thwarted by forces larger than himself.  In the extremist language of his older peers, Akhror found an explanation for his family's struggles (both in Uzbekistan and in the United States) and, more importantly, he found interpersonal connection and people who reflected back to him that he was valuable and essential to a greater cause.  These emotional and interpersonal vulnerabilities fueled the conduct that led to the current offense.

### 2.    *Personal history and development*

#### A.    *Early Childhood*

The only child from the union of Saiera Gulyamova and Abror Ulanov, Akhror spent his early childhood in the remote village of Cernyak, Kazakhstan. The mud brick houses in which some of the family still resides were built by Akhror's grandfather and others of his generation on a former Soviet collective farm. Akhror has fond memories of Cernyak. After moving with his mother to Tashkent, he returned every summer to live for three months with his grandmother and extended family.

Akhror describes Cernyak as "his favorite place." The family compound was (and remains) rudimentary, but it felt familiar and safe to him. The outdoor kitchen between the homes was a gathering place and a center of activity for Akhror's family. Food was prepared over a wood-burning stove and bread was made in a mud oven. Vegetable gardens and animals raised on the family land were dietary staples. Family members describe subsistence as a shared effort that fostered community and strengthened family bonds.

2

While Akhror remembers the village of Cernyak as a peaceful place, his early home environment was filled with fear and stress caused by severe domestic violence between his parents. The marriage of Akhror's parents, when Ms. Gulyamova was twenty-one years old, was prearranged by her family members. Mr. Ulanov drank excessively and regularly abused Ms. Gulyamova. Mr. Ulanov was reportedly brutal with his wife. Ms. Gulyamova recalls that he choked her by pushing "pressure points" on her neck, and she describes verbal degradation and frequent physical attacks.  Ms. Gulyamova could not quantify how many times her husband was violent with her, saying only that it was "constant." Ms. Gulyamova also reported that her husband frequently raped her and brought other women to the home for sex. Ms. Gulyamova reports that she attempted to leave Mr. Ulanov on multiple occasions after abusive episodes, and recalls that her parents forced her to return to him each time with the admonishment that divorce brings shame upon a family.

Ms. Gulyamova's pregnancy with Akhror did not provide a respite from the violence. Even while pregnant, Ms. Gulyamova reports that Mr. Ulanov hit her with his hands and household objects, including scissors. On one occasion, Mr. Ulanov smashed her face with a teapot and left her with a concussion.  When Akhror was born, the violence continued. One winter, when Akhror was an infant, Ms. Gulyamova describes fleeing, barefoot, while holding Akhror in her arms. She recalls running several blocks in the snow to find refuge with her parents, only to be forced, again, to return to her abusive husband.

Ms. Gulyamova escaped Mr. Ulanov's relentless domestic violence when Akhror was four years old. Ms. Gulyamova initially fled to her aunt's home with Akhror, but she was turned away. After being rejected by her family, Ms. Gulyamova went to a nearby dormitory-style building where she was allowed to sleep on the floor with Akhror next to her. The subsequent period of residential instability ended when Ms. Gulyamova's brother, Shavkat Batirov, accepted her and Akhror into his home near Tashkent.

After living for several months with her brother, Ms. Gulyamova found an apartment in a decrepit Soviet-era building in poor neighborhood of the city. Ms. Gulyamova reports that she began writing articles for local publications and at times getting a small amount of money for her work. She reports that her writing sometimes brought her into contact with the authorities and resulted in detention if the piece was perceived as a critique of the local government.  Ms. Gulyamova reports that on several occasions she was brought into the local police station where she was questioned and

3

forced to sign false confessions. On one occasion, Ms. Gulyamova describes being hit and violently pushed from a chair. With no support or childcare, Ms. Gulyamova reports that friends or family would take Akhror on the occasions when she was detained overnight.

For Akhror, the urban environment of Tashkent stood in stark relief to the community warmth of Cernyak. Ms. Gulyamova worked long hours with no one to help her care for her son and Akhror has distinct memories of the sudden isolation that he experienced in Tashkent. Akhror says,

> "I was alone all the time. I walked to school alone and came home alone. My mother didn't get home until 9:00, so she left me dinner to eat by myself. I was really scared being alone and used to talk to myself to try to feel safe."

Akhror recalls returning from school to an empty apartment as young as five years old. The community support he knew in Cernyak was completely absent from his new environment. Akhror recalls that he did not know the people in his building and that he had no one to comfort him. The open, communal living in Cernyak was replaced with the bare, concrete hallways of his new home. Akhror developed a fear of the dark and remembers sitting at the window for hours waiting for his mother to walk around the corner. Extended family members wondered about Ms. Gulyamova's decision to leave Akhror unsupervised at such a young age, but because of Ms. Gulyamova's reputation for defiance, they chose not to question her.

Akhror also felt fearful of the world outside his apartment. Adults in the school that Akhror attended warned of "bad people" in the area who were snatching children and advised parents to accompany their children to school. Akhror recalls that he was the only student in his class who continued to walk to school alone and he remembers being terrified. Akhror's maternal aunt, Nargiza Batirova, believes that the fear and isolation that Akhror experienced at a young age contributed to a social vulnerability during his adolescence. Ms. Batirova says (via interpreter),

> "He was naive and susceptible to manipulation because he didn't feel secure."

Ms. Batirova believes that Akhror craved his mother's acceptance and validation and prioritized it above everything. Ms. Batirova recalls the excessive time that Akhror spent studying. Even when adults would encourage him to take a break and play, he would continue working. Ms. Batirova remembers Akhror's attempts to get recognition

from his mother and draw her attention away from the work that she prioritized over him. Ms. Batirova says (via interpreter),

> "Akhror used to take a piece of paper and divide it into four pieces. He would write something in a different language in each section and show his mom and say, 'See? I'm going to be a diplomat!'"

## B.    Late Childhood and early Adolescence

Akhror's childhood was punctuated with several extended separations from his mother.  At age nine, he moved in with his aunt, Iris Tillovbergamova, and her family while his mother traveled to Germany and worked for approximately one year.  By Akhror's account, he began making friends when he moved in with his aunt. Ms. Tillovbergamova's home was entirely different from the isolative world Akhror had been living in with his mother. Ms. Tillovbergamova had a husband and four children, and was very involved in the children's lives. The Tillovbergamov[1] home was the first time Akhror had experienced a father figure. Shukhrat Tillovbergamov was an involved father who spent time playing with his children and Akhror craved his attention.  Participation on a swim team in Tashkent helped Akhror experience success and develop some confidence. He began spending time with peers and was accepted into his cousins' network of friends.

But when Akhror was ten, his progress was abruptly interrupted. Ms. Gulyamova returned to Tashkent and immediately removed Akhror from the Tillovbergamov home, bringing him back to live alone in her empty apartment. Ms. Gulyamova left again in 2007 for four months of work in Malaysia, returning Akhror once again to live with his uncle, aunt and cousins.

Despite Akhror's discordant environments, he began to articulate a vocational direction as he became a teenager. Akhror's cousin, Islam Batirova, spent a lot of time with Akhror during summers in Cernyak. Mr. Batirova recalls that Akhror talked about wanting a job in which he would wear a tie. He talked about an interest in government work, and expressed a particular interest in diplomacy. Ms. Batirvoa recalls Akhror describing his desire to provide for his mother what his father never did, and recalls that he studied hard and achieved some academic success. As Akhror continued to work in school, he broadened his interests. Still drawn to government work, Akhror also became

---

[1] Women who are ethically Uzbek place an "a" at the end of the family name.

attracted to language study and the possibility of working as an interpreter. When asked about his interest in interpreting, Akhror says,

> "It was my dream when I was young to become an interpreter at the consulate. Or to be a diplomat or have some sort of government job. I really wanted to learn about other parts of the world and meet people from other places."

As Akhror moved into adolescence he took concrete steps toward achieving his goal. He set his sights on attending a competitive secondary school called Westminster, an international school in Tashkent affiliated with University of Westminster in London. For a full year, Akhror attended weekly private tutoring sessions in math and English. It was at this time that Ms. Gulyamova left for the United States, hoping for more financial security and an escape from the repression and injustice she and Akhror found as Kazakh citizens in Tashkent. At a critical period in his development, Akhror lost his only caregiving parent for an extended and uncertain period. Akhror continued to focus on his swim team and his studies and was ultimately granted admission to the Westminster. Family members recall Akhror's excitement about fulfilling his dream of acceptance at Westminster and recall his sincere motivation to work toward his future goals. Akhror continued to aspire to a career as an interpreter, hoping for a position someday in an embassy or consulate.

The aspirations that Akhror had worked so hard toward were never realized. Shortly after his acceptance to Westminster, Ms. Gulyamova began pressuring him to abandon the academic opportunity he had worked hard for and move to the United States to live with her. Torn between the pursuit of a vocational dream and a longing for his mother, Akhror, at the age of sixteen, chose the latter. Akhror's cousin, Nadir Tillovbergamov, was living with Akhror during this time and remembers the emotional strain he was under. Mr. Tillovbergamov says (via interpreter),

> "Akhror was totally torn between his love for his mother and his desire for Westminster. When he received the acceptance letter it was the same time his mother wanted him to go to the U.S. He didn't know what to do. He talked about it a lot. He was emotionally torn."

Mr. Tillovbergamov says that Akhror's sole reason for wanting to immigrate to the United States was to be with his mother. Many family members actively discouraged Akhror from moving to the United States and tried to dissuade Ms. Gulyamova from encouraging the move. Mr. Tillovbergamov recalls that Akhror was only mildly curious

about the United States and had no particular interest in leaving Uzbekistan. Mr. Tillovbergamov says,

> "The most important person to him was his mother. That is the only reason he went."

Akhror's decision to abandon his hard-earned acceptance at the Westminster School and join his mother in New York, once again left him without community and direction. At the exact developmental moment when Akhror needed to feel success in his growing independence and autonomy, he was thrust into an environment in which he did not have the tools to succeed.

C. **Late adolescence**

When Akhror arrived in the United States, his mother enrolled him in a large public school in Brooklyn where he did not speak the language and had no friends. Living alone with his mother, Akhror suddenly found himself in an unfamiliar community without any network of support. His mother's work schedule cleaning houses led to a replication of his childhood isolation in Tashkent.

Akhror sought to build a community of peer support by doing what he knew; he joined a swim team, enrolled in a martial arts class and started school. But language and cultural barriers made it difficult for Akhror to meet and connect with other young people his age and he felt lonely. Having studied with an English tutor in Uzbekistan, Akhror knew English grammar but could not speak English or understand it. Akhror recalls that it was six months before he could understand anything that was being taught to him in school. For Akhror this experience of isolation and failure to acculturate was deeply humiliating and distressing.  He flailed academically and ultimately dropped out of school. When his mother tried to redirect him back into the New York City public school system, she and Akhror were told by a school they visited that Akhror was too old to succeed there and should pursue his GED.  The come down for this adolescent, who was once accepted into a prestigious school in Uzbekistan and was now being shunted out of the United States school system, was devastating.

When asked about this period of his life, Akhror describes entering a very difficult time in which he "could not sleep."  Akhror's descriptions of his insomnia and inability to focus on any activity suggest that he was becoming depressed, something that his mother also noticed.  Concerned and hoping to help Akhror feel better, Ms.

Gulyamova got him a dog because of his life long love of animals. However, financial instability and Akhror's difficulty caring for the dog, forced them to give the dog away—another devastating failure to Akhror. Ms. Gulyamova clearly remembers Akhror's deep distress at the loss of the dog.

At this time of disconnection, loss and lack of purpose, Akhror began exploring the internet for lectures on Islam and became engaged in a more devout practice of Islamic prayer and faith.  He noted that his insomnia was "cured" by his engagement in Islamic prayer and he began to feel much better.  His more intense level of devotion and prayer, however, led to conflicts with his mother, whom felt he was becoming too controlling. Akhror would lecture Ms. Gulyamova about her style of dress and express displeasure with her way of life.  As Akhror's relationship with his mother began to strain, he became more engaged with the man who would become his co-defendant, Abdurasul Juraboev.  After one fight with his mother, Akhror ended up sleeping on the beach of a public park for several days.

The deterioration of his relationship with his mother marked the "final straw" in Akhror's alienation from his life in the United States. Having given up his life in Uzbekistan (where he had experienced a measure of success and age-appropriate goal-setting) in order to be with his mother in the United States, Akhror now faced the reality that even that relationship was failing.  Akhror's mother moved out of their apartment and, by age eighteen, he was living alone. The only potential roommate for Akhror was his co-defendant, Juraboev.

It is within this context of alienation and isolation that Akhror engaged in the immature, fantasy-filled dialogue of violent extremist thought with an individual who turned out to be an FBI confidential informant.  The acts that led to his charges--most of which are acts based in an escape fantasy from his depressing and unfulfilling life--cannot be separated from his emotional distress, disappointment fueled by his failed family relationships, and profound immaturity.  For Akhror, escaping the United States and all the failure he had had to absorb here, was the central motivating force in his deeply misguided plans.

**MITIGATING CIRCUMSTANCES**

There are several themes that are presented below as mitigating circumstances in the context of Akhror's charges.  The first three themes summarize risk factors Akhror suffered in his life, the presence of which increased the likelihood that he would suffer poor outcomes and emotional distress.  The final theme is a descriptor of Akhror's

temperament, as characterized by many who know him, as a kind and compassionate individual.

1. *Domestic violence*

Akhror's earliest childhood experiences—from development in utero to his toddler years-- took place within a context of chronic domestic violence by his father against his mother. Akhror's father threatened his mother constantly and demeaned and humiliated her. He beat her with his hands and with household implements, choked her to the point of losing consciousness. Ms. Gulyamova's memories of running barefoot from her home, with an infant Akhror in her arms, captures how early he was exposed to such stressful circumstances. The negative impact of this type of traumatic stress on a developing child has been well-documented.[2] The child who lives within a violent family suffers multilayered stress—that is, he lives with both the direct impact of witnessing violence and feeling the attendant fear and distress that accompanies this experience, as well as the indirect impact of the violence, in terms of having a traumatized mother whose own reaction to the violence likely impedes her ability to parent well. Young pre-school children who witness violence in their homes have been found to have behavioral problems, social problems, and low self-esteem. Akhror, while not behaviorally disturbed as a child, was noted by multiple people to be a quiet, introverted boy who seemed to be more focused on protecting animals than engaging with peers.

2. *Abandonment by father*

Compounding Akhror's experience of domestic violence, was his father's subsequent disappearance from his life. Ms. Gulyamova reports that, once she fled her husband's abuse, he showed no interest in staying in Akhror's life. Akhror's only memory of his father is when his father appeared at the family's door when Akhror was about six years old. Akhror's recalls fleeing from the house and hiding until his father left. He never saw his father again. Akhror's mother noted that she never spoke to her son about his father, though it was openly known in the community that he had abandoned their family and was living with another wife and children nearby. This kind of abandonment, woven so thoroughly into the fabric of Akhror's life, most certainly shaped his sense of himself. His later vulnerability to be drawn into a community of men who made him feel that he was valuable and that he belonged cannot be disentangled from his early years of being rejected and left by his father.

---

[2] Holt, S., Buckley, H., & Whelan, S. (2008). The impact of exposure to domestic violence on children and young people: A review of the literature. *Child Abuse and Neglect.* 32, 797-810

3. *Maternal Neglect*

Akhror's mother, herself traumatized, lived an itinerant life that resulted in long periods during which Akhror was alone or in the care of others. From as early as age six, Akhror experienced extended periods of his mother's absence, including at least three times when she left the country and put him in the care of others.  Akhror also has vivid memories of being alone and afraid in their apartment. Small children develop a sense of safety and security in the world, in large part through the experience of being cared for, protected and nurtured by a caring adult.  For Akhror, his mother's presence was uneven and unpredictable, likely contributing to his sense of unease in the world, a feeling that he clearly carried to the United States.

By the time Ms. Gulyamova left for the United States when Akhror was fourteen, he had already experienced extended periods of time without her and had lived most of his life without his father.  Nevertheless, at fourteen, he had begun the age-appropriate adolescent process of establishing goals for himself in school and with hobbies, such as swimming.  These normal adolescent goals were thwarted by his mother's request that he join her in the United States. Akhror's choice to join her, likely fueled by both a yearning for her as a parent and a sense of responsibility to help her in her life, meant that Akhror was forced to give up his own goals and plans. His subsequent failure in the United States fueled a depression and alienation that was directly linked to the eventual decisions that led him to the instant offense. Akhror's embrace of Islam allowed him to feel emotionally better, yet it also made him vulnerable to a group of individuals who distorted the tenets of the faith and drew Akhror in to the only community who had welcomed him in his new country.

4. *History of kindness and compassion*

When Akhror was a child, he was known as a quiet boy with a particularly strong connection to animals. Without exception, every person interviewed in the village of Cernyak remarked on Akhror's deep concern for the welfare of the animals in the community and offered examples of what they described as a special and unique concern for their well-being. Akhror's childhood friend, Eldar Abutalibov remembers collecting firewood with Akhror during one of his summer visits to Cernyak and recalls Akhror's pleas to the other boys to lighten the load on their donkey for fear of hurting him. Akhror's cousin, Islam Batirov says that Akhror was "soft" on animals and remembers Akhror refusing to fish with the other boys because he didn't want to inflict harm. Akhror's grandmother recalls that Akhror spent more time caring for sheep and donkeys than he did playing with other boys. When asked about his time

10

in Cernyak, Akhror reflects on the security that came with being known in the community. Akhror recalls that people knew him as a shy boy and respected his interest in animals without judgment.

Akhror was also known for his kindness and generosity. Shahida Batirova grew up with Akhror in Cernyak. Ms. Batirova recalls that Akhror was an exceptionally thoughtful child and consistently demonstrated concern for the other children in the community.  Ms. Batirova says about Akhror (via interpreter),

"He was very kind. All the children in the village got candy on New Years Eve. Most would eat it immediately. Akhror saved his and shared it with all of us. This was very unusual."

Ms. Batirova also describes Akhror's generosity in the context of the work he performed for her father during the summers. While many children worked with Ms. Batirova's father, Akhror was frequently singled out because of his diligence. When Akhror was rewarded with a piece of gum, Ms. Batirova recalls that he would divide it into five pieces and share it with the boys who had not earned it.

## CONCLUSION

Akhror Saidakhmetov's life, by the time he was nineteen years old, had been riddled with experiences of abandonment, family violence, poverty, and social alienation.  For Akhror, almost every system—micro and macro—was a source of disappointment, loss and fear. As a small child in Kazakhstan, he lived in a home in which his father violently abused his mother, until she fled.  Throughout his childhood, his mother left him for extended periods of time, forcing him to adjust to living with various relatives.  His mother's work as a journalist led to incidences of persecution and discrimination, the most severe of which were her multiple detentions and violent interrogations by police because of her work as a journalist, events that contributed further to his mother's traumatization.

As a teenager, with his mother once again having absented herself from him for several years, Akhror was faced with a move to the United States. Akhror had built a sense of community and purpose in his life as an adolescent in Uzbekistan, but with his move to the United States, his life was thrown into disarray and he was thrust into an unfamiliar environment without the tools to succeed.

By the time Akhror arrived in the US, at age of sixteen, with no English skills and essentially no source of support except for his overburdened mother, he was too old to succeed in an American high school but too young to be able to effectively find a role in his new country.  These years of dislocation for this newly arrived immigrant teen were disastrous for his sense of self. His ability to succeed in his home country, and now in this new country, were both massively compromised by the adults and the systems in which he found himself.  Even his attempt to find purpose for himself by adopting a puppy was thwarted when he and his mother could not manage the dog.  Especially for someone who had been compassionately drawn to farm animals growing up in Cheryak, this seemingly small failure was devastating for Akhror, and led to a worsening depression and an extended period of sleepless anxiety.

It is within this context of worsening mental health, failed autonomy and humiliating experiences within the larger systems of his both home country and newly adopted country that Akhror became engaged in more devout practice of Islam. His faith and practice became a source of great comfort to him and, in many ways, his first feeling of efficacy as a young man. His insomnia all but disappeared and he began to feel that he had a community. The charges against Akhror reflect his hunger for belonging and his adolescent desire to find a community. Akhror found connection and belonging in the United States through the practice of Islam. His faith brought him peace and a sense of belonging. Additionally, the identification with the *Ummah*—the larger community of Muslims who also faced persecution and adversity—was a powerful source of identity for Akhror.

Akhror's poor decision making led him to the charged acts, but it is important to see these acts in the context of his larger life experience and his young age.  His acts reflect a young person yearning for guidance and purpose, not a person wishing to do harm.

Respectfully,

Erik Mercer, L.C.S.W.

12