

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AAS:DMP
F. #2014R01413

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 15, 2017

By ECF

The Honorable William F. Kuntz
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Akhror Saidakhmetov
                 Criminal Docket No. 15-95 (WFK)

Dear Judge Kuntz:

        The government respectfully submits this letter regarding sentencing of defendant Akhror Saidakhmetov, currently scheduled for Wednesday, December 20, 2017 at 11 a.m. For the reasons articulated below, the government believes that a Guidelines sentence of 15 years' imprisonment, which is the statutory maximum sentence for the offense of conviction, is appropriate in this case.

I.    Background

      A.    Islamic State of Iraq and al-Sham ("ISIS")

        ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate"[1] in Iraq and Syria.

        On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist

---

[1] "Caliphate" is a term that is used to refer to ISIS's self-proclaimed system of religious governance, with Abu Bakr al-Baghdadi as the caliphate's self-proclaimed leader.

Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO. (Presentence Investigation Report ("PSR") ¶¶ 3-6).

B. The Offense Conduct

Beginning in 2014, the government began to investigate a group of individuals based in Brooklyn who either planned to travel to Syria to join ISIS or to finance the travel of other individuals to Syria to join ISIS. The defendant, a permanent resident of the United States and citizen of Kazakhstan, was part of that group.

1. Saidakhmetov's Pro-ISIS Ideology

The group first came to the attention of law enforcement as a result of online postings by Saidakhmetov's co-defendant Abdurasul Juraboev on an Uzbek-language social media website, Hilofatnews.com ("Hilofatnews").[2] On August 8, 2014, Juraboev posted a message to Hilofatnews in which he asked whether he could swear an oath of allegiance to ISIS in absentia, meaning from the United States, and whether, since he was located in the United States, it would be possible for him to engage in an act of martyrdom on U.S. soil, such as killing then-President Obama, because such an act would strike fear in the hearts of the "infidels," meaning Americans. (PSR ¶ 7).

In interviews with law enforcement agents in August 2014, Juraboev confirmed his belief in ISIS's terrorist agenda, including the establishment by force of an Islamic caliphate in Iraq and Syria, and stated that he would like to travel to Syria to engage in violence on behalf of ISIS "if Allah wills," and that he would harm then-President Obama or plant a bomb on Coney Island if ordered to do so by ISIS. (PSR ¶ 7).

Juraboev identified the defendant as a friend and coworker who shared Juaboev's views on ISIS. Juraboev stated that Saidakhmetov had discussed with him

---

[2] Hilofatnews was an Uzbek-language website that, at that time, propagated ISIS's ideology and called for its Uzbek-speaking audience to join ISIS. The website contained videos, pictures and articles of ISIS military operations in Iraq and Syria, video sermons about the "global caliphate," and calls to join jihad within the ranks of ISIS.

2

Saidakhmetov's wish to wage jihad by traveling to Syria to fight with ISIL or by engaging in violence in the United States. (PSR ¶ 7).

Subsequent investigation of Saidakhmetov revealed that, like Juraboev, Saidakhmetov had posted pro-ISIS comments on Hilofatnews. For instance, on August 4, 2014, Saidakhmetov made a post in which he referenced an ISIS video showing individuals pledging allegiance to ISIS as well as mass executions of Iraqi soliders by ISIS militants. Saidakhmetov wrote in the post, "Allohu Akbar [God is great] I was very happy after reading this, my eyes joyful so much victory." (PSR ¶ 8).[3]

As noted in the PSR, in October 2014, Saidakhmetov began working for co-defendants Abror Habibov and Akmal Zakirov at their mall kiosks stores, which included kiosks to repair cellular telephones. From October 2014 through his arrest, Saidakhmetov worked at Habibov and Zakirov's mall kiosk stores in Savannah, Georgia; Chesapeake, Virginia; Dover, Delaware; and Philadelphia, Pennsylvania. (PSR ¶ 48).

While working at the Chesapeake, Virginia kiosk in approximately November or December 2014, Saidakhmetov expressed his radical pro-ISIS ideology, showed a fellow employee jihadist videos, and tried to recruit the fellow employee to fight for ISIS. When Saidakhmetov was asked to stop espousing his pro-ISIS views, he replied that it was every Muslim's duty to go and fight in Syria.

2. <u>Saidakhmetov's Efforts to Travel to Syria to Join ISIS</u>

Court-authorized interceptions of electronic communications between and among Juraboev, Saidakhmetov and purported ISIS representatives revealed Juaboev and Saidakhmetov's commitment to traveling to Syria to join ISIS.

For instance, on September 14, 2014, Juraboev told Saidakhmetov that he had been in touch with ISIS representatives, who told him that the only way to get to ISIS-controlled territories in Syria was to go through Turkey. Saidakhmetov replied that he had also been in contact with ISIS officials, who told him that they would arrange to have ISIS members pick them up in Tuela, Turkey, to transport them to ISIS-controlled territories in Syria. (PSR ¶ 11).

In late September 2014, a confidential informant (the "CI") approached Juraboev at a mosque, while posing as an ideologically sympathetic individual, and met Saidakhmetov later the same day. During the course of their relationship, and in numerous recorded conversations, Saidakhmetov and Juraboev requested the CI's assistance with their efforts to travel to Syria to join ISIS. (PSR ¶ 14).

---

[3] The PSR incorrectly states that this post was made on August 4, 2015.

3

In a conversation on September 24, 2014, Saidakhmetov told the CI that his mother was aware of his desire to travel to Syria to wage jihad and therefore had taken his passport to prevent him from traveling. Saidakhmetov said that he planned to trick his mother into returning his passport by telling her that he intended to travel to Uzbekistan to visit relatives. Saidakhmetov stated that, if he did so, he could fly to Uzbekistan via Russia, but get off the airplane in Russia, fly from Russia to Turkey, and travel from Turkey to Syria. (PSR ¶ 15). When the CI asked why Saidakhmetov did not just fly directly from the United States to Turkey, Saidakhmetov stated, "America is catching [on], they are very strict now" and "it is better to fool them by flying here and flying there." Later in the same conversation, Saidakhmetov watched videos of ISIS training camps in Syria with the CI and stated that he was going to go there, referring to Syria, to "become a Mujahid on the path of Allah." (Complaint ¶¶ 20-21).

Saidakhmetov continued to express his pro-ISIS ideology while making his plans to travel to Syria to join ISIS. On November 21, 2014, Saidakhmetov asked Juraboev whether their "lands," referring to ISIS-controlled territory, were continuing to increase in size and expressing his hope that "God willing," ISIS would come to control even more territory the following year. (Complaint ¶ 24).

On December 9, 2014, Saidakhmetov asked Juraboev to "delete" Saidakhmetov's profile on "odnoklassniki," which is a Russian-based social networking site. According to Saidakhmetov, the "Americans" were able to "find out who you were from your posts in Uzbek on that site belonging to Uzbeks called [Hilofatnews, and] they can trace odnoklassniki too." Saidakhmetov was referring to the fact that the FBI traced back to Juraboev the posting in which Juraboev offered to kill President Obama and that Saidakhmetov had posted similar violent jihadist material on odnoklassniki. Juraboev promised to try to delete Saidakhmetov's profile. During the same conversation, Saidakhmetov asked Juraboev whether Juraboev was planning to buy a ticket to Russia or whether he would travel straight to Turkey. In response, Juraboev instructed Saidakhmetov not to discuss such matters on the phone. In a recorded telephone conversation the next day, Juraboev confirmed to Saidakhmetov that Juraboev had indeed deleted Saidakhmetov's profile on odnoklassniki. Agents from the FBI then attempted to visit Saidakhmetov's page on odnoklassniki and found that his profile had, in fact, been deleted. (Complaint ¶¶ 25-26).

Prior to being deleted, Saidakhmetov's odnoklassniki page had included, among other things, pictures and other imagery of ISIS, a picture of President Obama with his head in the cross-hairs of a rifle, and a picture of President Obama in an orange jumpsuit in the middle of a desert like similar pictures of ISIS prisoners who had been decapitated.

A query of airline reservation record databases revealed that, on December 27, 2014, Juraboev purchased a round-trip ticket to travel from John F. Kennedy International Airport in Queens, New York ("JFK Airport"), to Istanbul, Turkey, departing on March 29, 2015 and returning on May 28, 2015. In a recorded conversation on or about December 29, 2014, Juraboev told the CI that if Juraboev were questioned when leaving for Turkey, he

would state that he was traveling to Uzbekistan and would show his return ticket. (PSR ¶ 16).

Like Juraboev, Saidakhmetov wanted to purchase tickets to travel to Turkey so he could make his way to Syria. On January 8, 2015, Saidakhmetov told the CI that he would travel to Syria immediately if he had his passport. Saidakhmetov asked the CI to help Saidakhmetov find an excuse to get his passport back from his mother. Saidakhmetov told the CI that he could get a new passport, and asked another individual where he could print out a passport application. When the CI told Saidakhmetov that he could get a travel document in lieu of a passport, Saidakhmetov asked the CI to fill out the application for him and to forge Saidakhmetov's signature on the application. (Complaint ¶¶ 32-33). As noted above, Saidakhmetov was working at the mall kiosk business and was not located in New York at the time.) In that application, Saidakhmetov falsely stated that he intended to travel to Turkey, Uzbekistan and Kazakhstan and that he intended to do so for travel and entertainment. None of those statements were true.

When the CI told Saidakhmetov, at law enforcement direction, that he needed to come to New York City on February 2, 2015 for photographs and fingerprints for his travel document, Saidakhmetov called Habibov and asked Habibov for money to purchase his plane ticket to Syria. (PSR ¶ 18).

Saidakhmetov appeared at Homeland Security offices in New York City on February 2, 2015, as directed, for photographing and fingerprinting. On February 17, 2015, Saidakhmetov received the travel document in the mail. In a conversation with the CI, Saidakhmetov told the CI that his soul was already on its way to paradise. Saidakhmetov also told the CI that once he left the United States, he would rip up the travel document (PSR ¶ 19), an act that was similar to the acts of ISIS fighters ripping up their passports in ISIS-propaganda videos.

On February 19, 2015, Saidakhmetov called his mother and asked her for his passport. When his mother asked him where he wanted to go, Saidakhmetov told her that it was a sin to live in the land of infidels (meaning America) and that if a person has a chance to join the Islamic State and does not go there, he will be asked why on judgment day. After Saidakhmetov continued to ask for his passport, his mother hung up the phone. (Complaint ¶ 44).

The same day, Saidakhmetov and Habibov went to a travel agency on Coney Island Avenue in Brooklyn, where Saidakhmetov purchased a round-trip ticket for $571 to travel from JFK Airport to Istanbul, Turkey, departing on February 25, 2015 and returning on March 31, 2015. Saidakhmetov later told the CI that he had paid $70 and Habibov had paid the rest, and that Habibov promised to provide more money to assist with expenses while overseas, including the purchase of a weapon. (PSR ¶ 20). Habibov was later intercepted speaking with other members of the fundraising network to raise funds to support Saidakhmetov's travel to ISIS and to purchase a firearm for Saidakhmetov. (PSR ¶ 20). The

group raised $1600, which another co-defendant gave to Saidakhmetov at JFK Airport prior to his planned departure.

Early in the morning on February 25, 2015, agents arrested Saidakhmetov at JFK Airport as he attempted to board a flight with a final destination of Istanbul, Turkey. (PSR ¶ 22).

3.  Saidakhmetov's Back-up Plans to Engage in Violent Conduct

While planning for his travel to Syria, Saidakhmetov routinely hatched alternate plots – many featuring extreme violence in the United States – if he were unable to travel to Syria.

For example, on November 14, 2014, Saidakhmetov proposed to Juraboev that Saidakhmetov join the United States Army in order to act as a spy for ISIS. When Juraboev expressed skepticism about this plan, Saidakhmetov stated that if he were to run into any trouble, he could open fire on American soliders and kill as many of them as possible. (PSR ¶ 12).

On January 11, 2015, Saidakhmetov told the CI that if he was unable to get travel documents to go to Syria, "I will just go and buy a machine gun, AK-47, go out and shoot all police." Saidakhmetov also proposed purchasing a handgun, shooting a police officer, taking his gun, bullets and bulletproof vest, and going to FBI headquarters and shooting FBI agents. (PSR ¶ 17).

On February 19, 2015, after he had purchased airplane tickets to travel to Turkey, Saidakhmetov told the CI that, if they were detected at the airport, they could kill a police officer and use the officer's gun to shoot other law enforcement officers that arrived on the scene, which would reslt in their deaths. (PSR ¶ 20).

4.  Saidakhmetov's History of Confrontation in and out of Custody

Notably, the defendant's history reflects numerous instances in which he has engaged in physical fights and challenges to authority. Saidakhmetov's criminal history reflects an arrest on October 25, 2013, in which he apparently assaulted a law enforcement officer with intent to cause physical injury and resisted arrest. This appears to be the conduct for which Saidakhmetov was subsequently expelled from James Madison High School in Brooklyn, New York. He was convicted of disorderly conduct and received a conditional discharge. (PSR ¶¶ 40, 56).

Since his arrest, Saidakhmetov has likewise incurred similar disciplinary infractions while in custody (PSR ¶ 49):

- On May 20, 2015, Saidakhmetov threatened another individual with bodily harm, for which he lost 21 days good conduct time, was placed

>   in disciplinary segregation for 30 days, and lost his commissary privileges for two months.
>
> - On November 24, 2015, Saidakhmetov refused to obey an order from a BOP employee, for which he lost his commissary privileges for 60 days.
>
> - On March 25, 2017, Saidakhmetov walked up to the officer station, stared at an officer with a smile, and stated, "I am going to kill you today CO," using the initials CO to refer to the corrections officer. For threatening an officer with bodily harm, Saidakhmetov lost 27 days good conduct time, was placed in disciplinary segregation for 75 days, lost his commissary, email and visitation privileges for 180 days, and had his property impounded for 180 days.
>
> - On April 14, 2017, Saidakhmetov threatened an officer with bodily harm, for which he lost 27 days good conduct time, was placed in disciplinary segregation for 75 days, and had his property impounded for 120 days.
>
> - On the same day, Saidakhmetov refused to obey an order and interefered with a security device in prison, apparently the duress button, because his commissary had been taken away. For this activity Saidakhmetov lost 27 days good conduct time and was placed in disciplinary segregation for 30 days.
>
> - On April 23, 2017, Saidakhmetov failed to stand count, for which he lost his MP3 player for 30 days, though that sanction was suspended pending 30 days clear conduct.

In short, Saidakhmetov has demonstrated that, even in strict custodial situations, he is unable and unwilling to respect authority, and has three times threatened officers with bodily harm.

5. <u>Saidakhmetov's Arrest and Guilty Plea</u>

In a post-arrest statement, Saidakhmetov admitted that he supported ISIS. Saidakhmetov also said, as he notes in his sentencing submission, Saidakhmetov told law enforcement officers that he intended to attend the Abdullah Bukhari Islamic School in Turkey. However, Saidakhmetov had previously told a co-conspirator that he intended to go to the Bukhari school in order to find connections to help him get to Syria. Notably, other than admitting that he supported ISIS, Saidakhmetov minimized his conduct, or declined to speak about the conduct set forth above, throughout the post-arrest interview.

7

On March 9, 2015, a grand jury in the Eastern District of New York returned an indictment charging Saidakhmetov, Juraboev and Habibov. Saidakhmetov was charged with conspiracy and attempt to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, conspiracy to use a firearm, in violation of 18 U.S.C. § 924(o), and travel document fraud, in violation of 18 U.S.C. § 1546(a).

On January 19, 2017, the defendant pleaded guilty before Your Honor to one count of conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. (PSR ¶ 1). In his plea allocution, Saidakhmetov stated that he was a member of a conspiracy to provide material support to ISIS, knowing that ISIS was a terrorist organization that committed violent acts against civilians. (Plea Tr. at 34-36).

II.    The Sentencing Scheme and the Guidelines Calculation

Based on the offense of conviction, Saidakhmetov faces a statutory maximum sentence of 180 months' imprisonment.[4] The PSR calculates a total offense level of 37, which is based upon a base offense level of 26, a two-level enhancement because the offense involved the provision of material support or resources to a foreign terrorist organization with the intent, knowledge or reason to believe that the support or resources were to be used to commit or assist in the commission of a violent act, a 12-level enhancement because the offense involved or was intended to promote a federal crime of terrorism, and a three-level reduction for acceptance of responsibility. The defendant's Criminal History category is VI based on the application of the terrorism enhancement in Guidelines Section 3A1.4(a). With a total offense level of 37 and a Criminal History category of VI, the resulting Guidelines range is 360 months to life. However, because the statutory maximum sentence is 180 months, the effective Guidelines range is 180 months' imprisonment.

Notably, however, although Saidakhmetov accepted responsibility for his actions by pleading guilty to conspiring to provide material support to ISIS, his objections to the PSR call into question whether he should be awarded any reduction for acceptance of responsibility. Specifically, Saidakhmetov stated in his PSR objections that "to the extent that [he] discussed traveling to Syria, it was not related to fighting with ISIL or engaging in violent jihad. Rather, it related to the affirmative Muslim religious obligation to live within a declared Islamic caliphate." (Def. PSR Obj. at 2). In addition, Saidakhmetov stated in his PSR objections that he did not intend to travel overseas "to commit jihad" but instead to "study Islam at a madrassa founded by the Uzbek dissident cleric Sheik Abdullah Bukhari." (Id. at 4). These statements – in addition to being contrary to the evidence that the government would have presented at trial and inconsistent with Saidakhmetov's allocution that he conspired to provide material support to ISIS – are incompatible with acceptance of

---

[4] After the offense conduct was completed, Congress amended Title 18, United States Code, Section 2339B to increase the statutory maximum sentence to 20 years, or 240 months' imprisonment. At the time of the offense, however, the statutory maximum sentence was 15 years, or 180 months' imprisonment.

8

responsibility. Nevertheless, because of the 180 month statutory maximum sentence, the denial of credit for acceptance of responsibility would have no effect on the overall Guidelines range.

The government agrees that the effective Guidelines range is 180 months' imprisonment. In addition, in the plea agreement, the defendant also stipulated to a Guidelines calculation with an effective Guidelines range of 180 months' imprisonment.

III.     Argument

    A.    The Court Should Sentence the Defendant to 180 Months' Imprisonment

In addition to the range recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant (§ 3553(a)(2)(C)).

In this case, the sentence imposed must reflect the seriousness of the defendant's conduct, deter the defendant specifically from committing further crimes, deter others from traveling to join ISIS, and promote respect for the law. These factors all counsel in favor of a Guidelines sentence.

The conduct is undeniably serious. Saidakhmetov agreed with Juraboev and others to travel to Syria to join ISIS and wage violent jihad. Saidakhmetov made online postings in which he communicated his approval of the actions of ISIS, and sought to establish contact with ISIS. He then discussed with others his desire to travel to Syria to join ISIS, and specifically how he would get to Syria. Saidakhmetov purchased a ticket to Turkey, from which he intended to go to Syria and join ISIS. Saidakhmetov repeatedly expressed the desire to engage in violent acts and to kill American law enforcement agents and members of the American military. All of these actions demonstrate the defendant's intent to join a foreign terrorist organization and to wage jihad on behalf of the foreign terrorist organization. Notably, Saidakhmetov also engaged in obstructive conduct when he instructed Juraboev to delete Saidakhmetov's profile on odnoklassniki so that the FBI could not find that profile. He also lied to U.S. authorities about the purpose of his foreign travel, omitting his ultimate destination of Syria, where he intended to join ISIS.

Moreover, the sentence should deter the defendant from committing future crimes, as well as deter others contemplating similar criminal conduct of joining a foreign terrorist organization to wage violent jihad. Given the defendant's sustained efforts to travel to Syria where he would engage in violent jihad as well as his post-arrest disciplinary conduct, the Court must also give serious consideration to the need to protect the public from

9

further crimes of the defendant (§ 3553(a)(2)(C)).  The government respectfully submits that this factor, when considered together with the seriousness of the defendant's conduct, warrants imposition of a Guidelines sentence.

The Guidelines themselves show that a sentence of 180 months' imprisonment is appropriate for deterrence purposes, by enhancing the defendant's criminal history category by 12 levels for a crime of terrorism and by placing the defendant in Criminal History Category VI.  As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).  The Court continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id.

B.  The Court Should Reject the Defendant's Request for 72 Months' Imprisonment

Saidakhmetov's arguments in favor of a lesser sentence should be rejected.  In his sentencing memorandum, the defendant advocates a sentence of six years based on a number of different factors.

*First*, Saidakhmetov argues that he never perpetrated violence against the United States and that his support for ISIS involved protected speech and protected religious beliefs.  The crime of providing material support to ISIS, however, is itself a violent crime in that Saidakhmetov provided that support knowing—as Saidakhmetov allocuted in his guilty plea—that ISIS was a terrorist organization that committed violent acts against civilians.  Moreover, Saidakhmetov also stipulated in the plea agreement to a two-level enhancement because his crime involved the provision of material support or resources to ISIS with the intent, knowledge or reason to believe that the support or resources were to be used to commit or assist in the commission of a violent act, as well as a 12-level enhancement because his involved or was intended to promote a federal crime of terrorism.  Further, the attempted travel to Syria to join ISIS—as manifested in his arrest on the jetway at JFK Airport—is not protected speech but rather unprotected criminal conduct.  Finally, as detailed above, Saidakhmetov came up with a number of alternative plans in the event that he was unable to travel to join ISIS in Syria, each of which involved killing law enforcement officers or American soliders here in the United States.  In light of these facts, the Court should reject Saidakhmetov's argument that his crime is somehow less culpable because it did not involve the perpetration of violence against the United States.[5]

---

[5] Moreover, the government is not asking this Court to punish Saidakhmetov for any expressions of protected speech or protected religious belief.  Saidakhmetov's statements are relevant to his intent – specifically, Saidakhmetov's pro-ISIS statements corroborate his

10

*Second*, Saidakhmetov argues for a sentence of 72 months based on an entrapment defense. Saidakhmetov contends that "sentencing entrapment" warrants a reduced sentence. Sentencing entrapment—which has not been recognized in the Second Circuit—"normally 'requires that a defendant convince the fact-finder that government agents induced [him] to commit an offense that [he] was not otherwise predisposed to commit.'" United States v. Deacon, 413 Fed. Appx. 347, 350-51 (2d Cir. 2011) (quoting United States v. Caban, 173 F.3d 89, 93 n.1 (2d Cir. 1999)). Moreover, even where sentencing entrapment "has been approved in theory," i.e., by courts outside the Second Circuit, "its potential application has been limited to outrageous official conduct which overcomes the [defendant's] will." United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1997).

Here, as an initial matter, the government notes that the defendant does not appear to dispute that he was predisposed to travel to join ISIS and therefore was not entrapped into conspiring to provide material support for ISIS. Instead, the defendant appears to argue that he was entrapped into committing the firearms and false document offenses that form the basis of Counts Three and Four. (Def. Mem. at 27-28). Notably, these are not the counts of conviction, and the government is not—as the PSR recommended—seeking an upward departure on the basis of that conduct. (PSR ¶ 76).[6] In any event, there was no improper conduct by the government with respect to these offenses or otherwise. The firearms charge is based not on Saidakhmetov's efforts to "ideate domestic violence" (Def. Mem. at 28), but rather on the efforts by Saidakhmetov and his other co-defendants to raise and provide him with money in advance of his travel to Syria for Saidakhmetov to pay for a gun once he had joined ISIS. As for the travel document charge, even assuming that Saidakhmetov's claim is to be believed that he was not aware of the ability to obtain the particular kind of travel document at issue here, Saidakhmetov had raised the prospect of stealing his passport back from his mother, applying for a new passport, and other similar efforts to be able to travel to Syria, and authorized the CI to submit the application for the travel documents on his behalf. Finally, it is undisputed that Saidakhmetov obtained the travel document through material fraudulent statements.

Apparently recognizing the inapplicability of his argument for sentencing entrapment, Saidakhmetov next argues that "imperfect entrapment" could also warrant a reduced sentence. However, it is not clear that there is any distinction between what Saidakhmetov describes as "sentencing entrapment" and "imperfect entrapment." Imperfect entrapment, Saidakhmetov says, is government conduct that "does not give rise to an entrapment defense but that is nonetheless 'aggressive encouragement of wrongdoing.'" Def. Mem. at 28 (citing United States v. Bala, 236 F.3d 87, 92 (2d Cir. 2000)). But

---

intent to travel to Turkey specifically for the purpose of joining ISIS in Syria and waging jihad on behalf of ISIS.

[6] Indeed, because the Guidelines range of 180 months is based on the statutory maximum sentence for the offense of conviction, no upward departure is even possible.

"sentencing entrapment" is itself conduct that does not give rise to an entrapment defense, which would be a defense to the crime. Thus, in United States v. Oliveras, 359 Fed. Appx. 257 (2d Cir. 2010), the Second Circuit described what Saidakhmetov refers to as "sentencing entrapment" "perhaps more aptly, under the rubric of imperfect entrapment." Id. at 261.

Even if there were a separate ground of "imperfect entrapment," a sentence below the advisory Guideline is not warranted on that ground. Saidakhmetov argues that the CI escalated his radicalization, encouraged him to travel to Syria to join ISIS, and provided him with the means to do so. But the record reflects that Saidakhmetov had already expressed his support for ISIS before ever meeting the CI, and not that the CI affirmatively encouraged Saidakhmetov's criminal acts. Likewise, before the involvement of the CI, Saidakhmetov and Juraboev had already discussed traveling to Turkey in order to make their way to Syria to join ISIS. Indeed, Saidakhmetov told Juraboev that he had been in contact with ISIS officials, who had told him that they could have ISIS members meet them in Turkey to assist them in getting to ISIS-controlled territories in Syria. And while Saidakhmetov's mother had taken his passport from him in an effort to prevent him from traveling, Saidakhmetov actively proposed various schemes to get his passport back from his mother or to apply for a different passport, and authorized the CI to submit the travel document application on his behalf once he learned of that alternative. In short, this is not a case where any kind of reduced sentence is warranted.

*Third*, Saidakhmetov argues that a 72-month sentence provides adequate deterrence to criminal conduct because he is remorseful for his actions and is sufficient to protect the public from any future crimes of the defendant. However, Saidakhmetov's post-arrest conduct does not support the notion that he just wants to serve his time and move on with his life. As noted above, he has engaged in significant misconduct while in custody, including threatening another individual with bodily harm in May 2015, telling a Bureau of Prisons employee that he would kill him in March 2017, and threatening an officer with bodily harm in April 2017. In addition, Saidakhmetov has several other disciplinary violations for failing to obey directions by BOP staff. These are not the actions of someone who merely wants to "peacefully serve the balance of his sentence." (Def. Mem. at 29).

Saidakhmetov also argues that he wants to engage in study of the peaceful aspects of Islam, citing his post-arrest statement to the FBI, in which he stated that he hoped to study with Sheikh Bukhari's madrassahs in Turkey rather than proceeding to Syria to join ISIS. (Def. Mem. at 31). However, given that Saidakhmetov's post-arrest statement included extensive minimization of his conduct and his refusal to talk about many aspects of the conspiracy to which he later pleaded guilty, there is no reason to credit Saidakhmetov's post-arrest statement that he was not trying to travel to Syria to join ISIS but instead wanted to study with Sheikh Bukhari. Moreover, as noted above, Saidakhmetov had previously told a co-conspirator that he intended to go to the Bukhari school in order to find connections to help him get to Syria.

*Fourth*, Saidakhmetov argues that a 72 month sentence is warranted given the periods of incarceration imposed on other defendants who have been found guilty of similar

12

conduct. Saidakhmetov points to 14 cases contained in a study by the Center on National Security at Fordham Law School in support of his claim that the average sentence for ISIS-related crimes is 9.2 years. However, a closer look at the cases cited in the defendant's submission reveals that nearly all comparable defendants received sentences of 180 months' imprisonment or close to 180 months' imprisonment. Of the cases cited at pp. 34-36 of the defendant's sentencing submission, only eight are cases involving a conviction for providing material support to a foreign terrorist organization. Of those eight cases, the defendants in four cases received sentences of 180 months' imprisonment (Morgan, Davis, Elfgeeh, and Saadeh); one defendant received a sentence of 144 months' imprisonment even though the government had sought a sentence of only 9 years' imprisonment (Teausant); one defendant who was 17 years old at the time of the offense received a sentence of 136 months' imprisonment (Amin); and two defendants who cooperated with the government—and therefore are not similarly situated to Saidakhmetov—received sentences of 82 months' imprisonment and 48 months' imprisonment (Wolfe, Conley). Indeed, in Conley, the district judge imposed a sentence of 48 months' imprisonment because the government itself advocated such a sentence in light of the defendant's cooperation. See United States v. Conley, 14-CR-163 (D. Colo.), Docket Entry 81 at 8, 33.

       The defendants in the remaining six cases are not similarly situated because they were not being sentenced for convictions on the same charge as Saidakhmetov. For instance, one defendant was sentenced for a violation of 18 U.S.C. § 922(g), which carries a maximum sentence of 120 months' imprisonment, and was actually sentenced to that maximum sentence (Diaz). Two other defendants were sentenced for making false statements in violation of 18 U.S.C. § 1001 (Coffman, Abood), and another defendant was sentenced for conspiracy in violation of 18 U.S.C. § 371 (Hodzic), both of which carry a maximum sentence of five years. Finally, the remaining two defendants were sentenced for misdemeanor violations of 18 U.S.C. § 111(a), which carries a statutory maximum sentence of one year, and both were sentenced to terms of probation (Said, Abdulkadir). The defendant highlights Abdulkadir and Abood in particular as pleading guilty to more egregious conduct, but in the former, the defendant pleaded guilty to a one-count information charging him with a Class A misdemeanor (Abdulkadir, No. 16-CR-0002, Docket Entry 113 (D. Minn. Mar. 8, 2016)) and in the latter, the defendant—who had served as an interpreter working with U.S. forces in Iraq—was charged with lying to the FBI about whether he had ever pledged allegiance to Abu Bakr al-Baghdadi, the leader of ISIS, and sentenced to 48 months' imprisonment (Abood, No. 15-CR-256, Sent. Tr. 9-14, 94, ECF No. 58 (N.D. Tex. June 2, 2017)).

       Of course, the most relevant comparison to a similarly situated defendant is to Saidakhmetov's own co-defendant Juraboev. On October 27, 2017, this Court sentenced Juraboev to a term of imprisonment of 180 months for engaging in the same conduct and participating in the same conspiracy in which Saidakhmetov participated. The government respectfully submits that a sentence of 180 months' imprisonment is also warranted for Saidakhmetov.

13

IV. <u>Conclusion</u>

For all these reasons, the government respectfully requests that the Court sentence the defendant to a Guidelines sentence of 180 months' imprisonment in order to provide just punishment, promote respect for the law, and provide adequate deterrence to others contemplating similar acts.

                Respectfully submitted,

                BRIDGET M. ROHDE
                Acting United States Attorney

By:   /s/ Douglas M. Pravda
      Douglas M. Pravda
      Alexander A. Solomon
      Peter Baldwin
      David K. Kessler
      Assistant U.S. Attorneys
      (718) 254-7000

cc:    Adam Perlmutter, Esq., counsel for Saidakhmetov (by ECF)
       Clerk of the Court (WFK) (by ECF)